In the Matter of the NEW YORK TITLE AND MORTGAGE COMPANY, SERIES C-2.

Supreme Court, New York County, September 19, 1935.

*Benjamin J. Rabin* [*Adolph Kaufman* and *Henry Weiner* of counsel], for the Mortgage Commission.

*Harry Rodwin* [*Samuel A. Reiser* of counsel], for the Superintendent of Insurance, as rehabilitator of the New York Title and Mortgage Company.

*William A. Shea* [*John B. Warner* of counsel], for the Superintendent of Insurance, as rehabilitator of the National Mortgage Corporation.

*Paul Windels, Corporation Counsel* [*S. S. Rogers* of counsel], for the City Chamberlain.

*Weil, Gotshal & Manges* [*Frank L. Weil* of counsel], for the Series C-2 Committee.

*Maurice B. Blumenthal* and *Natanson, Pack & Abrams*, for the Independent Guaranteed Mortgage Certificate Holders Protective Committee.

*Wise, Shepard & Houghton* and *Abraham N. Geller* [*Ralph A. Newman, Abraham N. Geller* and *Irving J. Galpeer* of counsel], for the C-2 Promulgating Certificate Holders.

Other appearances for parties interested.

FRANKENTHALER, J. Two separate proceedings are now before the court for the reorganization of a group of first mortgage participation certificates issued and guaranteed by the New York Title and Mortgage Company and known as series C-2. The principal amount of the certificates is $24,419,857.83, of which $235,069.29 represents the unsold portion, including certificates held by the

title company. The principal amount of the 102 mortgages securing the certificates, including foreclosed mortgages, is $24,348,726.48, while the cash collateral available for the payment of principal is $71,131.35. Series C-2 is the second largest group series, in respect to principal amount, involved in the entire guaranteed mortgage situation, being exceeded only by series F-1. It is the most widely held of all the issues, there being 7,496 separate certificate holders.

Admittedly the affairs of series C-2 are now in a deplorable condition. Of the 102 mortgages only four, aggregating $138,000, were not in arrears on June 30, 1935. On that date the arrears of interest amounted to $2,391,435.03, almost ten per cent of the entire issue, and the tax arrears to $370,043.02, while the cash in the income account available for the payment of interest and taxes was only $40,660.57. Since the Superintendent of Insurance became rehabilitator of the title company on August 4, 1933, interest arrears have mounted from $681,713.21 to $2,391,435.03 while tax arrears were reduced by several hundred thousand dollars. From August 4, 1933, to April 30, 1935, the annual interest earned by the entire series was only 1.385 per cent of the face amount of the outstanding certificates. No interest has been paid to certificate holders since March 1, 1933, except certain equalizing adjustments of $87,799.02. One of the 102 mortgages covers property known as Hampshire House which is an unfinished building producing no revenue whatsoever, although it constitutes a serious financial drain upon the resources of the series, the expenses for the period from August 1, 1933, to April 30, 1935, aggregating $107,574.14. The mortgage on this property amounts to $2,201,227.48, which represents approximately one-eleventh of the principal amount of all the mortgages in the series. It is estimated that another million dollars will be needed to complete the structure. Another very large mortgage ($1,800,000) covers a dilapidated brewery, badly in need of demolition, and four loft buildings. No cash was received from these premises during the period commencing August 4, 1933, and expiring April 30, 1935, although taxes and other charges were substantial. Taxes alone, during this period, were $54,068.25. A mortgage of $2,500,000 covers a Park avenue apartment house which is more than fifty per cent vacant and which yielded only $8,458.62 available for interest in the same period of almost twenty-one months. Another $270,000 is tied up in a mortgage on vacant land at Lakeville, Long Island. Tax arrears on this property as of April 30, 1935, amounted to $57,160.94.

*Although no interest, except the comparatively trivial adjustments previously referred to, has been paid to the series C-2 certificate holders,* the following payments were made for so-called " servicing " and

management charges: (1) To the Superintendent of Insurance, as rehabilitator, from August 1, 1933, to July 31, 1934, $75,277.30; (2) to Servicing Corporation of New York, as agent for the Superintendent of Insurance, from August 1, 1934, to March 31, 1935, $54,109.75; (3) to the receivers of subsidiaries of the title company as a reserve for expenses, $57,411.15; and (4) to the managing agents of each property the usual and customary charges of such agents. In addition, the Mortgage Commission, which took over the affairs of series C-2 on May 16, 1935, has set up a reserve for servicing charges at the rate of about $91,000 per annum. The Servicing Corporation of New York, which had been acting as agent for the Superintendent of Insurance, has been retained as agent by the Mortgage Commission. The annual charge of the Servicing Corporation is now five-sixteenths of one per cent of the principal amount, in addition to which one-sixteenth of one per cent is paid to the Mortgage Commission on account of the latter's expenses. Many of these charges have been made and continue to be made in respect to properties such as Hampshire House, the Lakeville property, etc., which are not only yielding no income whatsoever, but are, in addition, a constant source of expense. The amount deducted for " servicing charges " on these non-income producing properties is based, in each instance, upon the principal amount of the mortgage. No consideration, whatsoever, is given to the absence of revenue.

It would, however, serve no useful purpose at this time to discuss in greater detail the present condition of the various properties in series C-2. The Mortgage Commission itself, in its letter to certificate holders dated June 1, 1935, has declared that it finds " this issue in a most complicated and unsatisfactory condition." Concededly the issue is badly in need of reorganization.

The Mortgage Commission of the State of New York has promulgated two plans of reorganization. One of the plans is promulgated under the Schackno Act and, therefore, requires, in order to become effective, in addition to the court's approval, the *affirmative consents* of two-thirds, in principal amount, of the certificate holders. The other plan is promulgated under the recently enacted Mortgage Commission Act which permits a plan of reorganization to take effect after judicial approval unless *affirmative dissents* are filed by one-third, in principal amount, of the certificate holders. The only difference between the two plans in respect to content is that the latter, in accordance with the requirements of section 7 of article V of the Mortgage Commission Act, makes provision for the payment to dissenters of the value of their mortgage investments as of the date of the plan.

Both plans are now before the court for approval, modification or disapproval. Both the Schakno Act and the Mortgage Commission Act expressly authorize the court to " approve, modify or disap-prove." (Laws of 1933, chap. 745, § 6, subd. 2; Laws of 1935, chap. 19, art. V, § 7.) Neither plan may take effect at this time even if its provisions meet with the court's approval, for the plan promulgated under the Schackno Act has not as yet received the number of consents required by that statute, while the time to file dissents to the other plan has been extended by the court, as here-inafter pointed out, and has not yet expired.

The Mortgage Commission concededly prefers to have the reorganization of series C-2 proceed in the first instance under the Schackno Act rather than under the Mortgage Commission Act. Although both acts have been held constitutional (*Matter of People* [*Tit. & Mtge. Guar. Co.*], 264 N. Y. 69; *Matter of People* [*West-chester Title & Trust Co.*], 268 id. 432), the legality of any specific plan of reorganization has not yet been passed upon under either act, at least by an appellate court. In fact the United States Supreme Court, in declining to take jurisdiction of the appeal from the decision of our Court of Appeals upholding the Schackno Act, expressly stated (*Abrams* v. *Van Schaick*, 293 U. S. 188, at p. 189): " The motion for injunction, denied by the Court of Appeals, was made in advance of the promulgation of a plan by the Superintendent of Insurance applicable to the interests of the appellants. Whether, if a plan of reorganization is promulgated by the Superintendent of Insurance it will be approved by the Court as required by the statute, or whether, if so approved, it will be opposed by certificate holders, or will receive the assent of the present appellants, or will operate to deprive them of any asserted constitutional right, are matters of conjecture. The appeal is dismissed for want of a substantial federal question."

In sustaining the constitutionality of the Mortgage Commission Act the Court of Appeals recently took pains to point out that it was not passing upon anything except the constitutionality of the creation of the Mortgage Commission by the Legislature and its power to take over from the Westchester Title and Mortgage Company, an insolvent corporation, in the process of liquidation, the control of a certificated mortgage investment and the authority to " service " the same: " The questions which we can pass upon on this appeal are narrow. The statute which provides for the appointment of the Mortgage Commission purports to confer upon the Commission powers and authority to perform acts which, it is said, may deprive owners of mortgages of their property without due process of law or which may impair the obligations of contracts.

In this case the Commission is asserting only the power to take over from Westchester Title and Trust Company, now in liquidation, the control of the mortgage investment and the authority to 'service' the mortgage investment which until now has been exercised by the Title Company as agent. All that we can now determine is whether the legislative grant of that power to the Mortgage Commission violated any mandate or restriction imposed by the Constitution of the United States or the Constitution of the State of New York. *No question of whether attempted legislative grant of other powers, or attempted exercise by the Commission of powers granted to it, results in unlawful taking of property or impairment of contract is now presented or determined.*" (Italics mine.)

The *affirmative consent* of two-thirds, in principal amount, of the certificate holders is obviously a far more convincing indication of their approval than the assent *presumed* from the *failure* of certificate holders *to affirmatively file dissents.* A plan receiving the affirmative consents of two-thirds of the certificate holders is, of course, less vulnerable on constitutional and other grounds than one taking effect by virtue of the absence of affirmative dissents. Then, too, a reorganization under the Schackno Act need make no provision for paying off dissenters, whereas the opposite is true of a reorganization under the Mortgage Commission Act. The Mortgage Commission itself has expressed a desire that efforts be made to secure the consents required by the Schackno Act, and that resort be had to the proceeding under the Mortgage Commission Act only if the consents required under the Schackno Act cannot be obtained within a reasonable time. With this policy the court is in complete agreement. Accordingly no action will be taken by the court with reference to the plan promulgated under the Mortgage Commission Act until a reasonable opportunity has been had to achieve reorganization under the Schackno Act.

At this time, therefore, the court will confine itself solely with the merits of the plan promulgated under the Schackno Act. The plan calls for the administration of the affairs of series C-2 by a trustee and is identical, in most respects, with trustee plans already approved by this court in many other series. In fact, it was this court which first advocated the desirability of trustee management of the various issues of guaranteed mortgage certificates, more than a year ago, at a time when the Superintendent of Insurance was promulgating corporate plans of reorganization. (*Matter of New York Title & Mortgage Co.,* 150 Misc. 488; *Matter of New York Title & Mortgage Co.,* Id. 89; *Matter of New York Title & Mortgage Co.,* Id. 679; *Matter of New York Title & Mortgage Co.,* 153 id. 858, 865.) In so far as the proposed plan adopts the principle of trustee

management of the affairs of series C-2, it necessarily meets with the court's approval.

The proposed plan does, however, depart from the trustee plans previously approved by the court in two very material respects, viz., (1) in the form of trustee proposed, and (2) in the manner of the trustee's selection. The plan calls for the administration of series C-2 by a corporate trustee with a board of five directors, three of them the Mortgage Commissioners, or their successors, or the nominees of the Mortgage Commission, and the other two appointees of the court. (At the hearings upon the plan the Commission consented to the elimination of the provision permitting nominees of the Commission to serve as directors.) The commissioners are to serve without compensation, while the directors to be designated by the court are to receive such compensation as the court may fix, but not more than $15,000 per annum for each of them. The court's appointees are to devote their full time and attention to the affairs of the trustee. (The Commission, at the hearings, consented to a proposed amendment eliminating this requirement.) The members of the Commission, on the other hand, are free to devote as much or as little time as they choose to the problems of series C-2. All the stock of the corporation is to be held by the Mortgage Commission which agrees, as sole stockholder, that " it will, at all times, vote the stock for directors of the corporation so as to effect the selection of directors as hereinabove set forth."

The legality of the provision for such a corporate trustee has been assailed by counsel for various certificate holders on many different grounds. At least one of the objections appears to possess considerable merit. The Mortgage Commission Act authorizes the Mortgage Commission to act as trustee itself (§ 4, subd. 18), or else to organize for that purpose subsidiary corporations " wholly owned and controlled by it." (§ 4, subd. 19.) The act also provides that where a plan of reorganization proposes the formation or appointment of a corporation to represent the certificate holders of any issue, the Commission shall have the right to obtain a court order modifying the plan so as to make it provide that the Commission may designate *one* of the directors. (§ 12.) The only one of these powers which could possibly be regarded as authority for the corporate trustee proposed is that which authorizes the formation of subsidiary corporations " wholly owned and controlled " by the Commission. No other powers conferred upon the Commission by the Mortgage Commission Act are at all in point here. Subdivision 22 of section 4, relied upon by the Commission, does not appear to confer upon the Commission any additional or more extensive powers in respect to the formation of subsidiary corpora-

tions. On the contrary, the very language of that subdivision confirms the view that the Legislature intended to limit the Mortgage Commission's right to organize subsidiary corporations to " corporations wholly owned and controlled " by the Commission.

Is the corporate trustee proposed in the plan a subsidiary corporation " wholly owned and controlled " by the Commission? The Commission is, it is true, to be the sole stockholder of the corporation. It binds itself, however, as part of the plan, to vote its stock in such a way that two of the five directors shall be court appointees. This means that one of the three Commission directors may deprive the Commission of its control of the corporation by voting with the two court appointees on one or more propositions coming before the board of directors. The other two members of the Commission, representing a majority of the Commission, might thus be outvoted and relegated to the status of a dissenting minority. As the Mortgage Commission Act provides that the Commissioners shall act by a majority (§ 2), it appears to be clear that the corporation would not be " wholly owned and *controlled* " by the Commission. It is not enough that the Commission may retain control as long as all three of its members continue to vote together on all matters coming before the corporate board of directors. *To satisfy the requirements of the statute there must be no reasonable possibility of the Commission's losing control.* Although it is to be expected that the members of the Commission will vote together as directors of the corporation, there is no legal or practical assurance that this will occur. It is quite possible, as one of the Commissioners admitted at the hearings, that on many questions one of the Commission directors may honestly agree with the two court appointees. In that event it would be his duty, under our corporate laws, to vote in accordance with his own independent judgment, regardless of the views of his fellow Commissioners. (*Manson* v. *Curtis*, 223 N. Y. 313, 322, 323; *McQuade* v. *Stoneham*, 263 id. 323, 328, 329.)

Nor does there appear to be any satisfactory method of overcoming the difficulty thus presented. A provision that the vote of two of the three members of the Mortgage Commission, as directors of the corporate trustee, shall constitute the vote of all three, would be illegal, for, as previously observed, our corporate laws require each director of a corporation to exercise his own individual and independent judgment. (*Manson* v. *Curtis*, *supra; McQuade* v. *Stoneham*, *supra.*) " Clearly the law does not permit the stockholders to create a sterilized board of directors. Corporations are the creatures of the state and must comply with the exactions and regulations it imposes." (*Manson* v. *Curtis*, *supra*, 323.) No stipulation which would obligate a director to cast his votes in a

manner contrary to his own beliefs would be legal. A provision requiring the vote of four or of all five directors to give validity to resolutions of the board would also fail to solve the problem, for such a requirement would manifestly enable the court appointees to prevent action desired by the other three directors and would thus deprive the latter of control over the corporation.

Any attempt to sustain the legality of the proposed corporate trustee on the theory that the Commissioners in performing the functions of directors would be acting as individuals and not as members of the Commission must likewise fail, for the Mortgage Commission Act expressly provides that "Each member of the Commission shall devote his entire time to the performance of his duties." (Art. 2, § 2.)

It is unnecessary, however, at this time, to determine definitely whether the provision for the corporate trustee is illegal. No holding of the court in this proceeding that the proposed plan is legal or illegal would be binding in any subsequent proceeding involving a direct attack upon the legality of the plan. Sufficient has been said to indicate that there is, at the very least, grave doubt as to its legality. To approve a plan whose validity is open to serious legal question is obviously inadvisable, and justifiable, if at all, only if no other plan is feasible. As the court will point out presently, the plans heretofore approved by it enable the Commission, if the certificate holders desire it to do so, to become trustee of series C-2 in a legal manner and to administer the affairs of that issue. It will also be indicated that the proposed plan confers no advantages upon certificate holders which they do not possess under the plans which have hitherto received judicial approval and which are not of questionable validity. Under these circumstances there seems to be no justification for approving a plan of doubtful legality and thereby subjecting the successful reorganization of this issue to the perils and delays of involved legal proceedings and the possibility that the reorganization proceedings may have to be recommenced some time in the future. *The plight of the certificate holders of this series is entirely too serious to excuse indulgence in experiments which may ultimately prove disastrous without possessing any superiority, from the standpoint of the certificate holders, over the plans which have heretofore been approved and which are free from the legal doubts attaching to the corporate trustee proposed.*

Another objection to the proposed corporate trustee is the possibility that the income available to certificate holders may be unnecessarily depleted by reason of the substantial Federal taxes which might result from setting up a trustee in corporate form.

Furthermore, the proposed corporation is exceedingly inadvisable from a practical standpoint. The two directors appointed by the court would possess responsibility without control. They might be obliged to devote their full time to the affairs of the corporation without having any effective voice in its management. On the other hand, the other three Commission directors, beset as they are with their multitudinous duties, would obviously be free to devote very little time to the affairs of series C-2, and yet would be in a position to overrule any decisions or opinions arrived at by the two appointees of the court, and to run the corporation according to their own ideas. It is reasonable to assume that friction might follow.

The obvious purpose and object of the proposed plan is the administration of the affairs of series C-2 by a trustee controlled by the Mortgage Commission. This purpose and object can easily be attained — *if the certificate holders desire that result* — without all the objectionable features and defects inherent in the promulgated plan, by adopting the form of plan heretofore approved by the court in the various reorganization proceedings which have come before it. All the plans approved by the court since the creation of the Mortgage Commission have contained provisions enabling the certificate holders to vote for the appointment of the Mortgage Commission as trustee. If the majority, in principal amount, of the certificate holders casting votes favor the appointment of the Mortgage Commission as trustee, the preference of the certificate holders thus expressed is given effect. The Mortgage Commission would in this way be enabled to act as sole trustee, and none of the difficulties and defects of the proposal for a hybrid form of corporate trustee would be presented.

The claim has been made that approval of the *corporate* trustee plan would result in a financial saving to certificate holders. This is little more than conjecture. The Mortgage Commission does not intend to render services free of charge to the certificate holders of series C-2. On the contrary, series C-2 must share *pro rata* in the expenses of the Mortgage Commission (§ 24). At the present time the Commission charges one-sixteenth of one per cent of the principal amount of each issue on account of its overhead expenses, and a further charge is made by the Servicing Corporation of New York, retained as agent by the Commission, said charge amounting to five-sixteenths of one per cent of the principal amount of the issue. Both of these charges may be increased. At this time one can only hazard a guess as to what the cost of operation of the Mortgage Commission will amount to, or as to the *pro rata* share of the cost to be borne by series C-2. The share of the expense

allocated to an issue of large principal amount, such as C-2, may be utterly disproportionate to the amount and quality of the service rendered to that series. Series C-2, if the allocation of expense is based upon principal amount of the issue, may be obliged to pay as much as thousands of small issues receiving, in the aggregate, infinitely more attention and service from the Commission.

It is very doubtful, to say the least, that the Legislature ever contemplated that the Mortgage Commission might become an active candidate for the trusteeship of an issue such as series C-2. Commissioner Posner has testified that it would take *at least* four or five years to solve the problems of series C-2 which the Commission itself has characterized as " most complicated and unsatisfactory." Yet the life of the Mortgage Commission is limited to January 1, 1940, by the language of the Mortgage Commission Act (§ 34) and " may be terminated earlier by the Legislature." (*Matter of People* [*Westchester Title & Trust Co.*], *supra.*) The Commission is actively seeking to be intrusted with a task which it doubts can be completed during its own limited lifetime. The act does, it is true, confer upon the Mortgage Commission the power to act as trustee by court appointment, election or otherwise. (§§ 18 and 19.) When due consideration is, however, given to the purpose of the Mortgage Commission Act, as expressed in article 1 thereof, which declares the existence of an emergency and defines the emergency, it is difficult to believe that the Legislature intended to authorize the Commission to act as trustee in large and complex issues whose problems would extend beyond the period of the emergency and the life of the Commission. The following language of the Legislature renders it transparently clear that the dominant purpose of the act was to enable the holders of mortgage investments to organize themselves and withdraw their property from the control of the Mortgage Commission, a State agency (Art. 1, § 1): " The legislature, therefore, hereby declares the existence of a public emergency affecting the health, safety and comfort of the people, requiring the enactment of the provisions of this act. *Legislation adapted to meet the emergency by conferring power upon a new state agency to act promptly and to encourage, promote and facilitate self-organization by the holders of mortgage investments* until such time as there may be established other effective organizations for the administration of their interests is essential to protect the vital interests of the state." (Italics the court's.) This very language as well as the " temporary " character of the Mortgage Commission and its " special purpose " are emphasized in the opinion of the Court of Appeals in *Matter of People* (*Westchester Title & Trust Co.*) (*supra*), in which the constitutionality of the Mortgage Commission Act was upheld. That the

purpose of the act was to take the State out of the real estate business and to enable certificate holders to obtain control of their own properties was expressly recognized by the Chairman of the Commission in an address delivered by him on March 19, 1935: "*One fundamental policy, I think I may definitely state, and that is that it is the desire of this Commission to get out of the real estate business and to get the State of New York out of the real estate business. We certainly have no intention of attempting to perpetuate ourselves in power, however attractive it may appear.* As I see it, as respects any of the reorganization plans that may be formulated whether by the Commission or by the certificate holders, it is our duty to determine whether the plan is fair and equitable first and foremost to the certificate holders to whom we owe a primary obligation and having determined that the plan is fair and equitable to them, to see to it that the certificate holders have a fair and reasonable opportunity to express their preference and desire with respect to that plan. If the certificate holders decide that they prefer to have their property managed by trustees, I do not care who the trustees are so long as they are reputable and competent. The Commission in a dignified way will at all times stand ready and willing to serve the certificate holders as trustees or otherwise *but I do not propose to put this State mortgage agency in the position of being a grasping, self-seeking, candidate for power.*" (Italics the court's.) It is impossible to reconcile the present attempt of the Mortgage Commission to become, in effect, trustee of this large and complicated issue with the avowed object of the act "to encourage, promote and facilitate self-organization by the holders of mortgage investments," or with the views publicly expressed on more than one occasion by the Chairman of the Commission.

For the reasons indicated, the court disapproves the proposed plan *to the extent that it calls for a corporate trustee.*

As previously stated, the promulgated plan also differs from the plans of reorganization previously approved by the court in respect to the manner in which it is proposed to select the trustee. The plans heretofore approved have left it to the certificate holders to determine how the trustee is to be selected. They have contained provisions permitting the certificate holders to vote for trustees of their own selection, or for trustees appointed by the court, or for the Mortgage Commission as trustee. The plan proposed by the Mortgage Commission contains no such provisions. Instead of permitting the certificate holders themselves to decide in what manner the trustee or the trustees shall be selected, it imposes upon them a trustee chosen by the Mortgage Commission and affords the certificate holders no opportunity to express their personal

preferences and desires as to the identity of their own trustee. The certificate holders are thus confronted with the alternative of either approving a plan which calls for the appointment of a trustee chosen and controlled by the Mortgage Commission, or else obtaining no plan of reorganization at all, for the present, at least. Obviously it is not fair to the certificate holders to give them a choice between a plan arbitrarily adopted for them and no plan whatsoever. This court has repeatedly pointed out that in order to be fair to certificate holders a plan of reorganization which calls for trustee management should leave it to the certificate holders to decide for themselves how the trustee shall be chosen. (*Matter of New York Title & Mortgage Co.*, 150 Misc. 488; *Matter of New York Title & Mortgage Co.*, Id. 89; *Matter of New York Title & Mortgage Co.*, 153 id. 858, 875.) In the case of series F-1, the largest of all. the certificated issues, between one-third and one-half in principal amount of the certificate holders, with only a single dissent, urged the court to submit a plan providing for temporary trustees of its own appointment. Despite the overwhelming insistence of the certificate holders who expressed their views in the hearings on the plan, the court declined to submit a plan which provided for temporary trustees of its own appointment and instead adopted a plan which left it entirely to the certificate holders at large to decide for themselves whether they wanted trustees of their own selection or trustees chosen by the court. (*Matter of N. Y. Title & Mortgage Co.*, 153 Misc. 858, 875.) The form of plan thus adopted by the court has apparently met with the favor of the Mortgage Commission itself, for all the trustee plans promulgated by the Commission since it came into existence have been patterned after it, with the single exception of the plan promulgated for series C-2. No satisfactory reason for distinguishing between series C-2 and all the other issues of guaranteed mortgage certificates has been called to the court's attention, and the court is unable to perceive any justification for depriving the certificate holders of series C-2 of the right, which is justly theirs, to decide for themselves how their trustee or trustees shall be selected.

Attention should be called at this time to the fact that accompanying the proposed plans of reorganization submitted to the certificate holders was a questionnaire on which certificate holders were invited to indicate whether they approved the trustee corporation proposed by the Mortgage Commission or preferred trustees appointed by the court or trustees elected by themselves. The questionnaire itself stated that it was desired merely " for the information of the Supreme Court," and the letter accompanying the questionnaire reiterated this thought.

Up to August first only 2,471 of the 7,496 holders of C-2 certificates had indicated their preferences by filling out and returning the questionnaires. The principal amount of the certificates held by those thus responding was $6,681,004.72, out of a total of $24,419,857.83 outstanding. In other words, about thirty per cent of the certificate holders, owning approximately twenty-five per cent in principal amount, availed themselves of the questionnaire as a means of indicating their views to the court; 1,633 of the certificate holders who filled out and returned the questionnaires, owning $4,288,241.69 in certificates, favored the corporate trustee; 365 owning certificates amounting to $857,426.48 favored trustees appointed by the court, and 172 holding $524,702.86 in certificates desired trustees elected by the certificate holders themselves; 301 additional certificate holders owning certificates of a face amount of $1,010,633.69 filed consents to the plan, without filling out the questionnaire. It was admitted on behalf of the Mortgage Commission that these 301 consents may not be regarded as expressions in favor of the corporate trustee proposed, since they are consents to a plan which expressly provides that " should the court decide at or after the hearing that some other method of choice of trustee shall be employed, then the method so designated by the court shall be deemed to be the method provided for in this plan." The consents themselves expressly state that they are " consents to any modifications " of the plan that the Supreme Court shall approve. It follows that these 301 consents are not consents to the specific plan proposed and to the particular trustee suggested, but rather consents to the plan with such modifications as the court may deem proper. The failure of those executing the 301 consents to answer the questionnaire tends to confirm the view that these consents may not be counted as votes in favor of the proposed corporate trustee.

The preferences expressed in the questionnaires do not constitute an authoritative indication of the wishes of series C-2 certificate holders as a class, for the following reasons: (1) The questionnaires purport to be intended merely for the information of the court without binding it in any way. (It is quite possible that many of those who paid no attention to the questionnaire and saw no need for filling it out would have expressed their views in favor of trustees elected by certificate holders or appointed by the court if they had had any idea that the preferences indicated in the questionnaires, no matter how few were filled out and returned, would be given great weight by the court.) (2) There is no authority, statutory or otherwise, for the sending out of the questionnaires to the certificate holders and the answers contained in such question-

naires as have been returned can, therefore, be treated as nothing more than informal expressions of opinion on the part of those who indicated their preferences in the questionnaire. (The questionnaires were not even provided for in the proposed plan.) (3) The answers to the questionnaires were solicited and most of them obtained prior to the hearings upon this new form of plan, with the result that most of the certificate holders responded before they could obtain the benefit of the discussion, at the hearings, of the merits and demerits of the proposed corporate trustee — a discussion which might have influenced them to alter their views, for the sentiment against the plan was overwhelming.

More important, however, than all these considerations is the fact that certificate holders owning certificates aggregating in excess of $7,482,129.34 have indicated that they favor either a three-trustee plan or an *official* ballot by the certificate holders as to the method of selecting the C-2 trustee or trustees. Prior to the date fixed for the hearing upon the Mortgage Commission's plan, Frank Weil, counsel for the committee of C-2 certificate holders, and City Chamberlain Berle forwarded a letter to the certificate holders in which they said: " The plan as promulgated by the Mortgage Commission is so radical a departure that we feel no decision should be made except by vote of the certificate holders themselves. They should have the opportunity, before final consummation of any plan, to express their preferences. Accordingly, we believe that after approval of a plan every certificate holder should be entirely free to exercise an untrammeled choice as to the method of selecting the trustees. It should be wholly up to him whether or not to leave the appointment of one or more trustees to the court or whether the Mortgage Commission plan should prevail." The letter asked the certificate holders to indicate whether they agreed with the policy outlined in the letter by signing and returning a postcard inclosed with each letter, the card reading in part as follows: " The undersigned agree with the policy outlined in your letter of June 20, 1935." Within three weeks certificate holders owning about $4,200,000 of certificates signed and returned the postcards, thereby indicating that they desired an opportunity to vote formally and officially upon the method of selecting the trustee or trustees *after* the court had approved a plan of reorganization. In the beginning of May, 1935, Mr. Weil and Chamberlain Berle prepared papers for the promulgation of a plan for the election or appointment of three trustees. Excluding certificate holders who signed and returned the postcards previously referred to, certificate holders owning approximately $1,900,000 of certificates signed these papers. The plan was never promulgated because the Mortgage Commission

proceeded with its own plan. It follows that certificate holders owning certificates aggregating about $6,100,000 have expressed themselves as favoring either the three-trustee plan or an official expression of preference as between the Mortgage Commission plan and the three-trustee plan. To these figures must be added the certificate holders who expressed preferences in the questionnaires for court-appointed or for elected trustees. This makes a total of certificate holders owning about $7,482,129.34 in certificates who have indicated, in one manner or another, their preference for a three-trustee plan or for an official ballot. These figures do not take into consideration numerous consents to a three-trustee plan, aggregating well over a million dollars, obtained by other counsel. In view of the fact that the questionnaire was an unofficial document which merely sought an informal expression of opinion on the part of certificate holders, it is obvious that any evidence which would apprise the court of the views and preferences of certificate holders who failed to fill out the questionnaire is entitled to receive the same consideration as expressions of preference stated in the questionnaires. It, therefore, appears that there are more certificate holders, both in number and in principal amount, who desire a three-trustee plan or a formal official ballot after the court has taken action upon the plan, than there are certificate holders who have expressed a preference in favor of the corporate trustee proposed by the Mortgage Commission. It is manifestly impossible for the court at this time to know the attitude and views of the large number of certificate holders who have not been heard from in respect to the manner in which the trustee for series C-2 is to be chosen. The only way in which the wishes of the certificate holders in this respect may be properly and authoritatively ascertained is by adopting the procedure followed in the previous plans approved by the court, viz., by enabling the certificate holders to express their preferences on official ballots, properly executed and witnessed, and tallied by referees in no way interested in the outcome of the voting.

For the reasons indicated the court is of the opinion that the plan for the reorganization of series C-2 should be modified so as to make it conform with the plans heretofore approved by the court in other group issues. More specifically, the plan is to make provision for a formal expression of the certificate holders' preferences between (a) the election of three trustees by the certificate holders, (b) the appointment of three trustees of the court's own selection, (c) the appointment of the Mortgage Commission as sole trustee. The model after which the plan is to be patterned is that adopted by the court in connection with the reorganization of series B-1, *i. e.*,

the series F-1 plan, with modifications made after the subsequent creation of the Mortgage Commission. In addition the amendments suggested by the attorneys for the series C-2 committee and counsel for other certificate holders who joined with them are approved, as well as those proposed by the attorneys for certificate holder McAdam. The court believes that the form of indenture adopted for series B-1 and other similar issues should be followed as closely as practicable, and that said form should not be departed from unless for good cause shown. The advantages and desirability of keeping the plans of the various issues of certificated mortgages as uniform as possible is recognized by the Superintendent of Insurance. In a recent note in the Columbia Law Review on New York Guaranteed Mortgages (35 Col. Law Review, 874, 892) the court's policy of maintaining uniformity wherever possible is approved: " The Courts have wisely required all structural plans to conform to a few approved prototypes; F- 1 furnishes the pattern for group series reorganizations and BX-19 for specific series set-ups."

In the course of the hearings various other questions arose, some of which were debated with considerable vigor and acrimony. There is no need of discussing these questions at the present time.

The court has previously granted a motion to extend the time for filing dissents to such later date as the court might subsequently fix. The time for filing dissents is now extended for a period of thirty days from the entry of an order embodying any action which the court may take in respect to the plan promulgated under the Mortgage Commission Act. The plan promulgated under the Schackno Act is modified as indicated in this opinion.

Settle order.