In the Matter of a Plan or Proposal by the MORTGAGE COMMISSION OF THE STATE OF NEW YORK to Exercise Certain of its Limited Powers with Respect to a Certain Group of Mortgages Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY and Designated as Series B-K.

In the Matter of a Plan for the Readjustment, Modification or Reorganization of the Rights of the Holders of Investments in a Certain Group of Mortgages Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY and Designated as Series B-K.

Supreme Court, New York County, October 3, 1935.

*Benjamin J. Rabin* [*M. L. Rabson, A. Kaufman, H. Weiner, J. L. Callahan* and *S. Howard Sundell* of counsel], for the Mortgage Commission.

*Harry Rodwin* [*S. A. Reiser* of counsel], for the Superintendent of Insurance.

*Kramer & Kleinfeld* [*Samuel Kramer* and *Barnet Kaprow* of counsel], for the Reorganization Commission of Series B-K.

Appearances for other interested parties.

FRANKENTHALER, J. Two separate proceedings are now before the court for the reorganization of a group of first mortgage participation certificates issued and guaranteed by the New York Title and Mortgage Company and designated as series B-K. The principal amount of the certificates is $13,155,957. The principal amount of the 170 mortgages securing the certificates, including foreclosed mortgages, is $13,223,950, in addition to which there is cash collateral in the sum of $59,310. There are 4,035 certificate holders. The series is one of the largest group series in respect to both principal amount and number of certificate holders.

Concededly, the financial condition of series B-K is such that reorganization is imperative. Arrears of interest as of May 31, 1935, amounted to $907,357.59, while tax arrears aggregated $50,964.05. On May 31, 1935, thirty-eight owners remained in possession of properties covered by mortgages of series B-K, aggregating $3,675,650, with arrears of interest on said mortgages amounting to $140,320.26 and tax arrears to $34,974.26. In the case of thirty-one mortgages, the rents have been assigned, while five others are under foreclosure without rent assignments. Eighty-two mortgages have been foreclosed and title taken in the name of subsidiaries of the title company or in the name of the rehabilitator. Only fourteen of the 170 mortgages in series B-K are not in arrears as to interest or taxes. The arrears of principal amounted on May 31, 1935, to $11,170,075.

No useful purpose can be served at this time by discussing the financial condition of series B-K in greater detail or by elaborating upon what has occurred since August 4, 1933, when the Superintendent of Insurance, as rehabilitator of the title company, took over the administration of series B-K. The urgent need for reorganization is evidenced by the fact that the Mortgage Commission itself has seen fit to promulgate two plans of reorganization, one of them under the Schackno Act (Laws of 1933, chap. 745, as amd.), and the other under the recently adopted Mortgage Commission Act (Laws of 1935, chap. 19, as amd.). The plans are identical

except that the one promulgated under the latter statute contains a provision for the payment to dissenters of the value of their mortgage investments as of the date of the plan, such a provision being required by section 7 of article V of the Mortgage Commission Act. The reasons for the promulgation of two plans are the same as those referred to in the court's recent opinion relating to the reorganization of series C-2 (*Matter of New York Title & Mortgage Co., Series C-2*, 156 Misc. 667).

The Mortgage Commission prefers to have the reorganization effected, if possible, under the Schackno Act, but wishes to be in a position to proceed under the Commission Act in the event that the necessary number of consents required to make a plan effective under the Schackno Act cannot be obtained within a reasonable time. The Commission has, accordingly, asked " that an interlocutory order be entered in the Schackno Act proceeding, approving the plan and an opportunity be given to secure the consents of the holders of two-thirds of the principal amount of the series under the Schackno Act and that the Mortgage Commission Act proceeding be kept open so that if those consents are not forthcoming within a reasonable time a final order may be entered in the Mortgage Commission proceeding. This request will be complied with and no action will be taken by the court in respect to the plan promulgated under the Mortgage Commission Act until a reasonable opportunity has been had to effect a reorganization under the Schackno Act."

For the present the court will, therefore, consider only the merits of the plan promulgated under the Schackno Act. The plan provides for the administration of the affairs of series B-K by three trustees and is substantially identical with plans of reorganization previously approved by the court in series F-1, series B-1 and various other issues. In determining whether the trustees are to be elected by the certificate holders or appointed by the court, the wishes of the certificate holders themselves are to be followed. In the event that the Mortgage Commission is appointed or elected, it is to be the sole trustee. In one respect, however, the promulgated plan differs materially from the previous plans approved by the court. Each of the latter contains provisions for a *formal* vote by the certificate holders, *after* the taking effect of the plan, as to whether they prefer the trustees to be elected by themselves or appointed by the court. The promulgated plan contains no such provisions. Instead, it calls for the submission to the certificate holders of a questionnaire at the same time as the plan is submitted to them, in which they may express their preferences between election and appointment of trustees. The questionnaire is to be

returned to the Mortgage Commission prior to the date set for the hearing upon the plan, and the result of the voting thereon " shall be made known to the court for its information on the date of the hearing upon the plan." The object of this departure from most previous plans has been to ascertain the preferences of the certificate holders in advance of the hearing on the plan rather than after the effective date of the plan.

As of August 12, 1935, 1,625 certificate holders, owning certificates of an aggregate principal amount of $6,439,702.24 (representing 48.9 per cent of the total outstanding certificates), had indicated their preferences by filling out questionnaires; 1,147, owning certificates aggregating $4,254,628.80, indicated a preference for the appointment of trustees by the court, while 478, owning certificates amounting to $2,185,073.44, expressed a preference for the election of trustees by the certificate holders; 141, owning certificates amounting to $854,654.04, filed consents to the plan without indicating their preferences. At the hearing upon the plan the Commission took the position that the returns from the questionnaires were " overwhelmingly expressive of the desire of certificate holders " that the court appoint the trustees; that " the questionnaire which it [the Commission] sent out has produced results which are so overwhelmingly in favor of the court to appoint trustees, that it feels it ought to urge upon the court that no further steps be taken to further ascertain that expression of sentiment; that the expression as already given in accordance with the affidavit heretofore submitted be given effect and that the court appoint trustees or trustee to serve in this series." Accordingly, the Commission urged that the plan be modified so as to eliminate the provisions for election of trustees by certificate holders, retaining merely a provision for the appointment of trustees by the court. Kramer & Kleinfeld, the attorneys for the reorganization committee of series B-K, and all the other attorneys for various certificate holders who expressed themselves at the hearings, joined in the request of the Mortgage Commission and pleaded for the appointment of trustees, with the single exception of the attorney for the Superintendent of Insurance, who took the position that the plan for series B-K should conform to the plans previously approved by the court for series F-1 and other issues, by providing for a formal and official expression of the preferences of the certificate holders after the plan had received the necessary number of consents to become effective.

If the principal amount of the certificates, owned by certificate holders who returned questionnaires indicating a preference for the appointment of trustees by the court, aggregated more than one-half of the total principal amount of the outstanding certificates,

the court would not hesitate to modify the plan in accordance with the virtually unanimous request of the attorneys who attended the hearing on the plan. Under such circumstances no useful purpose could possibly be served by providing for a formal balloting upon the very proposition in respect to which the certificate holders had already expressed their wishes in the questionnaires. The fact is, however, that somewhat less than one-half, in principal amount, of the certificate holders have so far expressed a preference for the appointment of trustees by the court. Owners of certificates totaling $4,254,628.80 have affirmatively stated in the questionnaires that they desire the court to appoint trustees. In addition, holders of certificates amounting to $854,654.04 have filed consents to the plan without filling out the questionnaire. These consents, as pointed out in the opinion relating to series C-2, are consents to any modifications that the court may see fit to make in the proposed plan and may accordingly be treated as votes for a plan providing for the appointment of trustees if the court prefer that method of selecting trustees. In all, therefore, owners of certificates totaling $5,109,282.84 have indicated that they are willing to have trustees appointed by the court. As against this, owners of certificates aggregating only $2,185,073.44 have indicated a preference for trustees elected by the certificate holders at large. The other certificate holders have remained silent. Although the returns, therefore, indicate that of the certificate holders who have been heard from, only two-sevenths in principal amount favor election of trustees, the aggregate principal amount of the certificates held by those comprising the other five-sevenths is about $1,500,000 short of one-half of the total outstanding certificates of series B-K.

Under such circumstances the court is of the opinion that the views previously expressed by it in the reorganization proceeding involving series F-1, the recent proceeding relating to series C-2, and other reorganization proceedings involving large group issues, obtain here with equal force. In the series F-1 proceeding, although "between one-third and one-half, in principal amount, of the F-1 certificate holders, with only a single dissent," urged this court to submit a plan providing for court-appointed trustees, the court declined to do so, pointing out that the fairest plan which could be submitted to the certificate holders would be one which contained provisions enabling the latter to cast formal and official ballots as to whether they preferred appointment or election of trustees. Similar action has been taken by the court in all the other large group issues which have come before it for reorganization. Although the questionnaires and the consents filed by certificate holders who have affirmatively indicated their views render it quite probable

that formal balloting on the issue as to whether the trustees should be appointed by the court or elected by the certificate holders would produce exactly the same result, there is at least a theoretical possibility that sufficient certificate holders who have not yet expressed their views may vote for the election of trustees to increase the total of those favoring that course beyond the aggregate amount of certificates owned by certificate holders who prefer the appointment of trustees by the court.

In this connection it is important to bear in mird that although the questionnaire is made part of the proposed plan, it does not thereby acquire the official and formal status possessed by the ballots cast under plans such as those adopted for series F-1, B-1, etc., since (1) the questionnaires are part of a proposed plan which has not yet taken effect, while the ballots under plans such as the F-1 plan are not cast until after the effective date of the plan, and (2) the questionnaires purport to be merely " for the information of the court," while the ballots are binding upon the court.

It should also be remembered that in no event can the court appoint trustees *at this time*, the plan not yet having received the number of consents required by the Schackno Act to make it effective. (*Matter of New York Title & Mortgage Co.*, 241 App. Div. 351; *Matter of New York Title & Mortgage Co.*, 243 id. 754.) The most that the court may do presently is to modify the plan so as to provide for the appointment of trustees *if and when the necessary consents have been obtained to make the plan operative.*

Moreover, modification of the proposed plan for series B-K so as to make it conform with the plans for other large group issues previously approved by the court, would work little prejudice to the certificate holders. If the latter, after the effective date of the plan should cast a vote favoring the appointment of trustees by the court, the appointment of the trustees could be made within a month at most, during which period the Mortgage Commission would remain in control of the affairs of the series, as it has been since May sixteenth of this year. The expense involved in connection with the balloting as to the method of selecting the trustees would be comparatively negligible.

Taking into consideration the informal and unofficial character of the questionnaires, the fact that so far less than half, in principal amount, of the holders of outstanding certificates have *affirmatively* indicated that they desire court-appointed trustees, and the relatively slight prejudice, if any, which the certificate holders might suffer as a result of providing for a formal vote on the question as to the method of selecting the trustees for series B-K, the court feels that in this instance no departure should be made from the plans previously approved for other large group issues.

The plan will, accordingly, be modified so as to make it conform with the plan recently approved for series C-2. The time for the filing of dissents to the plan promulgated under the Mortgage Commission Act is extended for a period of thirty days from the entry of an order embodying any action which the court may hereafter take in respect to that plan. Settle order.