In the Matter of a Plan for the Readjustment, Modification or Reorganization of the Rights of the Holders of Investments in a Certain Group of Mortgages Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY and Designated as Series B-K.

Supreme Court, Additional Special Term, New York County, June 21, 1937.

*Kramer & Kleinfeld,* for the trustees, Series B-K.

*William A. Shea,* for the Superintendent of Insurance of the State of New York, as liquidator of the New York Title and Mortgage Company.

*Maurice Finkelstein,* for the Mortgage Commission of the State of New York.

FRANKENTHALER, J. This is a proceeding for the fixation of allowances for services rendered in the reorganization of Series B-K of the New York Title and Mortgage Company and in " any actions or proceedings taken or affecting said Series B-K." (Declaration of Trust, art. VIII, subd. w.)

Series B-K is the third largest issue of guaranteed mortgage certificates in the entire State. At the time the plan of reorganization was modified and approved by this court, in October, 1935, the principal amount of the issue, consisting of 170 mortgages, was over $13,000,000, and there were more than 4,000 certificate holders. *(Matter of New York Title & Mortgage Co. [Series B-K],* 156 Misc. 808.) Although the trustees appointed by this court did not take office until the end of March, 1936, after the plan had obtained sufficient consents to become operative, the reorganization has already proved of marked benefit to the B-K certificate holders. In November, 1933, when efforts to reorganize the issue commenced, the B-K certificates were selling at about nineteen cents to every dollar of face value. When the plan was promulgated in June, 1935, the price advanced to thirty-eight cents. After the designation of the trustees the certificates rose to forty-six cents. Less than nine months after the trustees commenced to administer the affairs of Series B-K, the certificates were quoted at sixty-two and one-fourth bid, sixty-four and one-fourth asked. Even in the present depressed condition of the market (June 16, 1937) the quotation is fifty-seven and one-half bid, sixty asked. Although the improvement in real estate conditions undoubtedly contributed, it is generally conceded that the reorganization of the issue and the capable work of the trustees appointed by this court have been largely responsible for the very substantial rise in the market

price of the B-K certificates. In the first nine months of the trustees' management, two and one-half per cent was paid to certain certificate holders by way of interest and one per cent on account of principal. The trustees state that after deduction of all allowances for reorganization fees and for the administration of the trust they expect to be able to pay interest of at least four per cent during the year 1937. The gross earnings at the present time are approximately five and one-half per cent per annum after payment of all expenses and taxes, and the net return is about four and one-half per cent.

The general principles governing allowances in reorganizations of guaranteed mortgage issues have already been set forth by this court in making allowances for services rendered in the reorganization of Series F-1. (*Matter of New York Title & Mortgage Co.* [*Series F-1*], 160 Misc. 283.) There is no need to repeat them here. The difficulties and complex problems encountered by those who labored to reorganize Series F-1 were very much the same as those which faced the reorganizers of Series B-K, and it would, therefore, be superfluous to refer again to the chaotic conditions, described in the F-1 opinion (*supra*) which prevailed in 1933 and 1934 until the trustee plan of reorganization, which this court had repeatedly advocated, was finally recognized as the most desirable and beneficial possible from the standpoint of the certificate holders.

The successful reorganization of Series B-K is due in a very considerable measure to the untiring efforts of the firm of Kramer & Kleinfeld, the attorneys for the reorganization committee of Series B-K. This was expressly conceded by every one who spoke at the hearing of the present applications for allowances. Typical of the views expressed at the hearing are the remarks of counsel for the Mortgage Commission: " Your Honor was very modest in the F-1, in declining to take full credit for the trustee plan. You extended credit for the help you had received from the members of the Bar. I say it is an obvious fact, that one of the prime helpers who aided you in the evolvement of that trustee type of plan, was the firm of Kramer & Kleinfeld, and I would not forego the opportunity I have this morning to say to your Honor and the certificate holders and the public, that on behalf of the Mortgage Commission of the State of New York, as well as of myself personally, I take this opportunity to hold forth to Samuel Kramer and Barnett Kaprow, our sincere appreciation and gratitude and respect for the work that they did here. Their work was not only of high professional calibre from the standpoint of the legal work that they did, but even more important, the work that they did in contacting the certificate holders personally and dispelling in their minds the

fear and uncertainty that was rampant in 1933, by their warm and sympathetic approach — for this there can be no adequate compensation. Now, your Honor has before you a question of disposing of applications for attorneys' fees, and there again I say that unfortunately posterity will never know, because your Honor will never write what has actually happened here, but it has been my privilege to appear before you in the last nine months on fifty or sixty of these applications for attorneys' fees, in which I should say roughly half a million dollars was asked for. That was what was asked for; that was not what was allowed. * * * I am happy to say that on those fifty or sixty applications, when your Honor finally came down with your decision, reducing the amount requested to the irreducible minimum, my fellow members of the Bar, on reconsideration, bowed to your Honor's wisdom and said under the circumstances, they would be satisfied,— with one exception, and that one petitioner took your Honor's ruling up to the Appellate Division and the Appellate Division affirmed your opinion. All I can say by way of a short recapitulation is that I know and I can never forget what was done here, particularly by Kramer & Kleinfeld. Sometimes the passage of time dims our recollections of past difficulties and the effort expended in their solution, but it does not dim my recollection of it, and I am sure it does not dull the recollection of the Court, and my only anxiety is that the Certificate holders should to some degree have some slight appreciation of the work that was done here, and I may say that they need have no fear, on the basis of your Honor's recollection, as to what should be allowed here, and they may be assured that whatever may be allowed will be extremely modest, and the certificate holders should be satisfied that whatever your Honor allows, they should be happy to pay two or three times more." The services of Kramer & Kleinfeld, for which compensation is sought in this proceeding, commenced in the latter part of 1933, when they brought about the formation of the reorganization committee, and terminated with the qualification of the trustees on March 27, 1936, about two and a half years later. Generally speaking, these services were very similar to those rendered by the reorganizers of Series F-1, which was the first of the group mortgage issues reorganized. The fact that the plans adopted in Series B-K as well as in all other group issues were modeled upon the F-1 plan should not adversely affect the compensation of Kramer & Kleinfeld, for the latter's contributions to the trustee plan ultimately promulgated and adopted in Series F-1, and in the other issues, were very substantial. Mention should be made of the fact that Kramer & Kleinfeld insisted strenuously that trustee plans provide that the

trustees be vested with title to the underlying collateral and not merely with powers in trust. As a result, the certificate holders are assured that they, rather than the title company, will receive any profit which may be realized after payment of their certificates. Another consequence of vesting *title* in the trustees is that they are enabled to exercise broader powers than they might have possessed were they merely grantees of powers in trust. In various other respects this firm played an important role in the conferences which led to the formation and promulgation by the Superintendent of Insurance of the trustee plan for Series F-1. The firm participated in the legal actions and proceedings referred to in the Series F-1 opinion and also in many others not mentioned therein. In the *Abrams* proceeding, in which the constitutionality of the Schackno Act was involved (*Matter of People* [*New York Title & Mortgage Co.*], 264 N. Y. 475; appeal dismissed, *sub nom. Abrams* v. *Van Schaick*, 293 U. S. 188), Kramer & Kleinfeld argued in support of the constitutionality of the statute in the Court of Appeals and also appeared in the United States Supreme Court in addition to submitting briefs in both courts. From the time that the firm commenced its attempt to reorganize Series B-K in the fall of 1933, it kept in very close touch with the certificate holders and kept the latter informed as to the financial condition of the issue and as to all developments affecting its affairs and the efforts to reorganize it. In addition to keeping the certificate holders advised as to the true value of their certificates, Kramer & Kleinfeld actively encouraged them to hold on to their certificates rather than sell them at the panic prices which at that time prevailed. The good will which the firm thus built up among the certificate holders undoubtedly proved of great value in securing their co-operation and prompt and united action when the time came to procure consents to the plan.

A further factor to be considered is that Kramer & Kleinfeld actively and vigilantly followed each and every detail of the administration of Series B-K during the time that the Superintendent of Insurance and the Mortgage Commission were in charge thereof in such a way that many substantial savings for the certificate holders were effected. For example, when these attorneys learned that the Superintendent was seeking to recoup advances made by the title company prior to March 15, 1933, out of interest remittances received from owners subsequent to that date, they objected and prevailed upon the Superintendent to allow these funds, aggregating $47,500, to remain in Series B-K. As a result it became unnecessary to bring the proceedings which have been instituted in most other series to attempt to trace wrongfully recouped funds.

The vigilance with which the firm watched out for the interests of certificate holders during the period in which the affairs of Series B-K were administered by the Superintendent and by the Mortgage Commission doubtless had much to do with the fact that unusually large distributions, aggregating two and seven-eighths per cent, were made to certificate holders by the Mortgage Commission *prior* to the designation of the trustees under the plan of reorganization.

After a thorough and painstaking investigation of the services rendered by the various applicants for allowances the trustees have submitted a report to the court in which they express their views as to the amounts which each should receive. This report recommends an allowance of $50,000 to Kramer & Kleinfeld for the services rendered by them in connection with the reorganization proper and an additional $25,000 for the work of supervision above referred to. In addition the trustees recommend that Kramer & Kleinfeld be allowed their disbursements of $8,908.17. Although the amounts recommended by the trustees would represent reasonable compensation if the services had been performed for ordinary clients, this court, in fixing allowances payable out of funds belonging to certificate holders, has adhered to the views expressed by it in *Matter of New York Title & Mortgage Co. (Series F-1)* (*supra,* pp. 307, 308): " In determining the amount of the allowances which are to be made to those applicants whose services merit them, the court has kept uppermost in its mind the plight of the unfortunate certificate holders. They have not received any substantial amount of interest for about three years and, of course, no payments of principal. Many of them are in straitened circumstances. Some have invested their entire life savings in these and similar certificates. Many of the certificates represent funds invested for incompetents, infants and widows. The public aspect of the situation was recognized by the Legislature itself in enacting the Schackno Act, which has been upheld by the Court of Appeals as ' emergency ' legislation. Section 1 of that statute states that ' the Legislature hereby declares the existence of a public emergency affecting the health, safety and comfort of the people,' and, further, that ' such mortgage investments are widely held by hundreds of thousands of investors, a large percentage of whom are persons of only moderate means.' Allowances payable out of funds belonging to certificate holders must necessarily be considerably less than they would be under ordinary and normal circumstances." After giving due effect to the considerations above referred to, the court has reached the conclusion that the services rendered by Kramer & Kleinfeld entitle them to allow-

ances of $30,000 for their work in connection with the reorganization proper and $10,000 for their services in connection with the administration of Series B-K up to the qualification of the trustees. In addition they are entitled to receive $8,908.17 in reimbursement of their disbursements.

One of the applications for allowances is made by Seidman & Seidman, a firm of accountants retained by the reorganization committee in May, 1934, to conduct examinations of all financial matters and transactions relating to the issue from the date certificates were originally issued in 1928 and to advise the committee and its counsel concerning the tax, accounting and budget features of the reorganization. The firm performed very valuable services from May, 1934, to the qualification of the trustees in March, 1936, a period of almost two years. These services enabled the reorganization committee to keep the certificate holders constantly informed of the financial condition of the properties underlying the issue and was the direct cause of many substantial savings to the certificate holders. No useful purpose can be served by discussing the services at greater length. According to the affidavit submitted by the applicants, partners of the firm, the chief of staff and the chief of the tax department devoted $588\frac{1}{2}$ hours to the affairs of Series B-K, while certified public accountants in their employ spent $796\frac{3}{4}$ hours and uncertified accountants 1,248 hours. In addition, stenographers and typists spent $344\frac{3}{4}$ hours. The trustees have recommended an allowance of $12,500 to the applicants. In the court's opinion this allowance, after taking into consideration the factors above referred to as well as those set forth in the F-1 opinion, previously cited, should be $7,500.

The firm of Cruikshank & Co., which made an inspection and appraisal of the 170 parcels in Series B-K as well as a summary analysis for the purpose of the hearing on the plan of reorganization, asks only that it be reimbursed for actual expenses and for the time spent by its employees. The bill amounts to $1,657. The court agrees with the trustees' statement, in their report, that the bill is very modest in amount and is a fair and proper expense of the reorganization committee. The applicant is accordingly allowed the sum of $1,657.

The only other applicants who are entitled to any allowances out of the B-K funds are (1) Cohen & Jarcho and Abraham N. Geller, who acted jointly, and (2) Edward Endelman. Each of the two applicants is allowed the sum of $1,000. As to the remaining applicants, the court adopts the views expressed by the trustees: " The Trustees are of the opinion that none of the other attorneys who have applied are entitled to any allowance for their

services herein. All of such services were either in a capacity as members of the Committee, for which they agreed to seek no compensation, or they were merely cumulative to the work done by Kramer & Kleinfeld. Inasmuch as none of these services were necessary for the protection of the certificate holders, nor, indeed, of any benefit to them, the Trustees cannot recommend any compensation therefor. The fact that some of these attorneys are not in a position to seek compensation from their own clients does not warrant the Trust Estate in paying for such services."

In this issue of $13,155,957 the total allowed by the court for reorganization fees and expenses to counsel, accountants and the real estate appraiser is $50,065.17. This means a total costs of less than forty cents to the holder of each $100 certificate, payable out of the moneys in the hands of the trustees without any assessment upon the certificate holders, exclusive of the allowance, previously referred to, for services independent of the reorganization.

Submit order on notice.