In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property and Rehabilitate the NEW YORK TITLE AND MORTGAGE COMPANY.

In the Matter of a Plan for the Readjustment, Modification or Reorganization of the Rights of All the Holders of Mortgage Investments Represented by Series F-1, First Mortgage Participation Certificates Issued and Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, Additional Special Term, New York County, July 1, 1936.

*Wagner, Quillinan & Rifkind* [*Simon H. Rifkind* of counsel], for the trustees.

*William E. Russell*, special counsel for the trustees.

*Edward Endelman*, for George Pleayl and others, certificate holders.

*Paul Windels, Corporation Counsel*, for the city chamberlain, certificate holder.

*Henry Hetkin*, for Mary Duberstein, certificate holder.

*Orrin G. Judd*, for Spelman College, certificate holder.

*Jacob Rieger*, representing self.

*Montague S. Mandelsohn*, for the Levmend Holding Corporation.

*Olin Potter Geer*, for the certificate holders.

*Leon B. Ginsburg*, for Rebecca S. Miller and others.

*Frank A. Kister*, for the estate of H. C. Hallenback.

*Maass & Davison*, for Sarah R. Heilbroner.

*Herman Hoffman*, certificate holder.

*Morris A. Rabinovitch*, for certificate holder.

*Edward C. O. Thomas*, for Ralph H. Beard, guardian, and E. C. O. Thomas and George M. McIlroy, as trustees of J. T. Dingel.

*William Brunner*, for Margaret Wolfe.

*James F. McNaboe*, for Paul W. A. MacMahan, trustee.

*O. H. Droege*, for O. H. Droege and Charles F. Boettcher, as trustees of Wanda Boettcher, deceased, for the benefit of Henrietta Bierholz.

FRANKENTHALER, J. Various applications for allowances, made by attorneys who claim they have rendered valuable services in connection with the successful reorganization of series F-1 of the New York Title and Mortgage Company, have been consolidated into one proceeding. The applications are made pursuant to subdivision v of article VIII of the Declaration of Trust, which constitutes part of the plan of reorganization finally adopted by the certificate holders. That subdivision authorizes the F-1 trustees, subject to the court's approval, to " pay the reasonable expenses of the Committee for the Reorganization of Series F-1 and reasonable fees for the services of counsel for said Committee and counsel

for certificate holders who have rendered services which have proved of value to the certificate holders in connection with the readjustment, modification or reorganization of the rights of all of the holders of said Series F-1 certificates."

Twenty applications were made within the time fixed by the court for the filing of claims for allowances, and an additional one was presented thereafter. Two of the applicants, one of them the chamberlain of the city of New York, ask only to be reimbursed for disbursements actually made, amounting to $850, and $662.17, respectively. Eleven others request allowances totaling $212,750, exclusive of disbursements of $700. The remaining eight do not ask for allowances in any specific sum, but leave it to the court to determine what amounts they are fairly and reasonably entitled to. As will presently appear, the eight applications in which no specific amounts are asked for are made by those who have rendered the most valuable services and who are entitled to the bulk of the compensation awarded. Included among these eight is the firm of Wagner, Quillinan & Rifkind, counsel for the committee for the reorganization of series F-1, hereinafter referred to as the " committee," which has concededly done by far the greatest part of the work involved in the reorganization. This firm does ask, however, to be repaid the sum of $3,038.55, which represents disbursements necessarily made — an extremely modest amount for the reorganization of a large issue of this character.

In support of the applications filed with the trustees, voluminous affidavits have been submitted, containing detailed statements of the services alleged to have been rendered by the respective claimants. Many of the services are of such a character that no compensation may properly be allowed for them in this proceeding. Some of the applicants have placed exaggerated valuations upon the services claimed to have been rendered by them. In numerous instances each of a group of applicants claims individual credit for the identical ideas and suggestions. It is obviously impossible within the limits of a judicial opinion to set forth the quantity, quality, character and value of the work performed by all those now seeking allowances. A statement of the general principles which have guided the court in determining which of the applications may properly be granted and in what amount must suffice. A brief outline of the history of the F-1 reorganization will make for a better understanding of the questions involved.

The F-1 issue was and is the largest single certificated issue in the entire guaranteed mortgage situation in this State. As of August 31, 1934, certificates of an aggregate principal amount of $27,463,985.28 were outstanding in the hands of the public, exclu-

sive of others totaling $446,973.24 held by the title company. The issue was a so-called "Group issue," the certificates being secured by a group of mortgages deposited with the Bank of Manhattan Trust Company. The mortgages, including those theretofore foreclosed, covered ninety-eight properties in the borough of Bronx and twenty-three in Manhattan. Prior to the reorganization the issue was in a deplorable financial condition. Only thirty-seven of the one hundred and twenty-one owners still remained in possession of their properties and only six of these were not in arrears. The other thirty-one were permitted to remain in possession and control, although they were in default as to past due principal in the sum of $4,443,481.67 and as to interest, taxes and amortization in the aggregate amounts of $326,743.23, $119,292.90 and $134,525, respectively. The total principal amount of the mortgages was $27,889,156.67, of which $14,852,056.67 was past due and unpaid. Arrears of interest were $1,911,468.44, of taxes $767,126.73, and of amortization $561,275. *Arrears of interest and taxes alone were $2,678,595.17.* To meet these arrears the then Superintendent of Insurance had in his hands only $98,025.66, exclusive of $139,463.40 retained by him as a reserve for the payment of his "service fee." From August 4, 1933, to October 5, 1934, only $116,106.71 had been paid to the certificate holders by way of interest as against $1,762,202.39, which they should have received at the guaranteed rate. *During the first thirteen months of rehabilitation (August 4, 1933, to August 31, 1934) there was a net increase of $550,348.13 in arrears of interest.*

In December, 1933, the committee for the reorganization of series F-1 was organized. Arrears of taxes, which constituted a prior lien to the claims of the certificate holders, aggregated at the time more than $1,000,000. Interest had not been paid to the certificate holders in some time and the market price of the F-1 certificates was about seventeen or eighteen cents for every dollar of face value. The legal nature of the relationship created by the certificates was something upon which the best legal minds could not agree. The Schackno Act (Laws of 1933, chap. 745), which had been passed at the previous session of the Legislature for the purpose of facilitating the reorganization of certificated issues, was thought by many to be unconstitutional, either entirely or in part. It was of the utmost importance that no mistakes or missteps should be made which might later be held to have impaired or destroyed the marketability of the titles to the various underlying properties. The problem was further complicated by the existence of the Federal equity receiverships of the Liberdar Holding Corporation and Land Estates, Inc., wholly owned subsidiaries of the title company.

The receivers, subject only to the jurisdiction of the Federal court, were in possession and control of many of the F-1 properties. There was, therefore, to some extent a conflict of jurisdiction between the State and the Federal courts. Opinion was divided on the question whether the remedy created by the Schackno Act was exclusive of all others, or, as many thought, merely additional to the remedies previously existing. Numerous attorneys who took the latter view believed that the Supreme Court had the right to appoint successor trustees of " powers in trust " which they thought had been vested in the title companies prior to rehabilitation. These are only a few of the numerous confusing legal difficulties and questions with which the situation veritably bristled at the time the first efforts were made to effect a reorganization of series F-1. These problems have been referred to in a recent editorial as " the stupefyingly complicated problems left in the wake of the mortgage loan debacle." It must be remembered that the F-1 reorganization was the first of its kind consummated under the Schackno Act and that there were no precedents to guide the attorneys in their efforts to formulate a suitable plan.

In the early days of Schackno reorganizations the corporate plan was the one favored by the Superintendent of Insurance. That plan had developed out of conferences of attorneys which had been called by counsel for the then Superintendent of Insurance, to work out a uniform plan of reorganization under the Schackno Act. Various other plans had been discussed at these conferences, but the corporate plan was the one then decided upon by the Superintendent.

After careful analysis and study of the factual and legal situation, the firm of Wagner, Quillinan & Rifkind (headed by United States Senator Wagner), which had participated in the conferences, undertook to bring about a reorganization of series F-1. Meetings of certificate holders were called which were attended by holders of more than $10,000,000 in principal amount of F-1 certificates. The committee for the reorganization of series F-1 was organized and the committee, in turn, caused a subcommittee to be designated, known as the " executive committee." The activities of these committees were guided from the very first by the firm of Wagner, Quillinan & Rifkind, which became its counsel. The necessary forms involved in the corporate reorganization had to be devised and carefully worked out. Numerous questions arose, for example, as to the taxability of the new corporation and the securities which it would issue, and many memoranda of law had to be prepared in connection with these problems.

At the same time another group of lawyers representing certificate holders was engaged in developing a trustee plan of reorganization. A conference was held in January, 1934, with the court, which was attended by both groups of lawyers. The spokesmen for the trustee plan group urged that even if successor trustees of the " powers in trust " could not be appointed by the court under existing law, it would be comparatively simple to amend the Real and Personal Property Laws so as to permit the appointment of trustees of an express trust. The views of the two groups could not be reconciled at that conference or at succeeding ones.

While the reorganization committee was working on the corporate plan, an application was made to this court for the appointment of successor trustees of the " powers in trust " alleged to be possessed by the New York Title and Mortgage Company. The committee opposed the application and upon appeal from the order below filed a brief as *amicus curiæ*. It feared that the appointment of the trustees was not authorized under the law as it then stood and that the titles to the F-1 properties might be jeopardized unless a ruling by an appellate court was obtained. The application was denied upon appeal (*Matter of New York Title & Mortgage Co.* [*Heilbroner*], 241 App. Div. 351), though previously granted below. At about the same time various other applications were made in this and other courts which added to the difficulties confronting the committee. A proceeding was instituted in this court for leave to bring actions for the appointment of trustees for all the certificated issues of the New York Title and Mortgage Company. (*Matter of Nemerov,* 149 Misc. 797.) When this proceeding met with no success, another was brought in the United States District Court for the Northern District of New York, in which the appointment of trustees for these issues was sought. Unsuccessful attempts were made by counsel for various certificate holders to obtain a writ of prohibition against further action by the District Court. An appeal was taken from the order appointing trustees, which was finally made by the Federal court, to the Circuit Court of Appeals, which reversed the ruling. (*Tolfree* v. *N. Y. T. & M. Co.,* 72 F. [2d] 702.) Another proceeding was commenced in this court to restrain the Superintendent of Insurance from expending any funds in his hands belonging to certificate holders for expenses incurred in connection with reorganizations under the Schackno Act, on the ground, among others, that the statute was unconstitutional. The litigation was carried to the Court of Appeals and finally to the United States Supreme Court. (*Matter of People* [*New York Title & Mortgage Co.*], 264 N. Y. 475; appeal dismissed, *sub nom. Abrams* v. *Van*

*Schaick*, 293 U. S. 188.) Many other applications, too numerous to discuss here, were made by various attorneys for different kinds of relief, all of which vitally affected the attempts to reorganize series F-1.

While the appeal in *Matter of New York Title & Mortgage Co. (Heilbroner) (supra)* was pending the committee and its counsel gave further consideration to the merits of a trustee plan and to the possibility and advisability of consummating such a plan under the Schackno Act. The conclusion was finally reached that an effective trustee plan could not be validly adopted without amendments to certain sections of the Real Property Law. Steps were accordingly taken by counsel for the committee to have the necessary legislation introduced and enacted. These efforts were successful, resulting in the amendment of sections 96, 103 and 174 of the Real Property Law and section 15 of the Personal Property Law. In the meantime, in anticipation of the Legislature's favorable action, counsel for the committee were engaged, in collaboration with counsel for the Superintendent of Insurance, in developing a satisfactory trustee plan which would also be acceptable to the latter. The approval of the Superintendent of Insurance was vital and practically indispensable at the time because, as the law then stood, a plan which was not promulgated by the Superintendent of Insurance could only be promulgated by the holders of one-third in face amount, of the outstanding certificates. Draft after draft was prepared and revised, and conference after conference was held in an endeavor to work out an appropriate trustee plan. Finally, in September, 1934, counsel for the Superintendent announced that he was ready to proceed with a new trustee plan. In the interim the corporate plan had come on for hearing before the court and a number of hearings had been had and adjournments taken from time to time. Although the Superintendent's plan was in various respects unsatisfactory to counsel for the committee, the Superintendent refused to promulgate it in any other form and it would have been extremely difficult to secure a speedy promulgation by certificate holders. Accordingly, a series of proposed modifications to the Superintendent's plan were prepared and submitted to the court on the return day. Many of the suggested modifications were adopted, in part or in whole, by the court. There followed the work of preparing the interlocutory order and devising forms and machinery for carrying out the provisions of the order. Finally came the enormous task of securing sufficient consents to the plan to make it effective under the Schackno Act. Consents aggregating more than $18,000,000 had to be obtained from certificate holders scattered all over the face of the earth.

The history of the F-1 reorganization and the complex problems and difficulties which it involved were so eloquently portrayed (at the hearing of the present applications for allowances) by counsel for the committee that the court can do no better than to quote his remarks at length:

" If your Honor please, we are here at the tail end of a long, difficult, disturbing, but nevertheless very happy proceeding — very happy because it ended happily. Let me say, if I may, your Honor, before I begin the few words that I intend to speak this morning, that having been before this Court on this matter for the last two years, and knowing this Court as I do, I take the liberty to say for the record that there will be no scramble this morning, that it will be a dignified proceeding, because it is the only kind of a proceeding which I think this Court will tolerate. I choose not to comment upon other untruthful statements that may have appeared in the public press.

" I would like, if I may be permitted, your Honor, to look back at the fall of 1933, at the time when this proceeding first came into being. We had the Title Company in rehabilitation under the supervision of the Superintendent of Insurance. The Company had been put into rehabilitation in August of 1933. It was a gigantic problem for the Superintendent, a difficult problem for any administrative agency, and I doubt that it is pertinent and relevant this morning to go into the general question of that period of administration. Suffice it to say that when we first appeared here some time in the late fall of 1933, we found that the certificate holders of Series F-1 who believed that they had a first mortgage interest in mortgages and properties covering 121 parcels in the Boroughs of Manhattan and the Bronx, in fact and in truth had their interest subject to a very large and very substantial prior lien; and I refer to the fact that it was subject to the prior lien of the City of New York for $1,118,000 in tax arrears. Calling it tax arrears does not minimize the fact that it was a claim superior to the claim held by the certificate holders of Series F-1; and that, in a sense, is also an evidence and an indication of the general condition of that series.

" There is no point in recalling the fact that interest had not been paid for some time, that certificate holders could not get ten cents on the dollar if they wanted to borrow on their certificates; that the best price publicly stated for the certificates was about seventeen or eighteen cents on the dollar with very few bids, though plenty of offers.

" So much for the financial picture, except to add that the prospect was not any brighter, no method had been designed or evolved

for the handling of so large a transaction, no machinery was yet in sight for the servicing of this huge aggregation of mortgages, no one knew what the prospect of the real estate market generally was except that it was very cloudy. Wrapped around this unfortunate and tragic and catastrophic financial situation was a blanket of legal chaos which served to darken the picture even more intensely.

"First of all we were dealing with certificates issued by New York Title & Mortgage Company, held by about 4,600 investors in this series alone; and there weren't three lawyers of the Bar of this City, whether distinguished or otherwise, who could agree as to the nature of the rights created thereby. Did that certificate represent a coordinate share of the mortgages as it appeared to state on its face? Did it simply constitute a certificate holder, one of a group of principals who had appointed an agent? Were they beneficiaries of a trust? Were they beneficiaries of an instrument which created powers in trust? We all had our opinions, we all had our views, but no one had such a complete conviction about it that he was ready to take a chance to involve the transmissibility of titles. When I speak of the legal difficulty inherent in this situation, your Honor, I think it is all-important that we impress upon the certificate holders, and indeed convey to the public that that was not simply a difficulty as to who shall or who shall not administer these funds, whether it shall be governed by one set of rules or by another where personal preference was the determining factor. No, the difficulty was to devise something which would make the legal titles to these properties valid and marketable and merchantable so that the certificate holders would have an asset and not a liability when ultimately they came into their inheritance. And any comment from whatever source, whatever it may be, that this was a conflict for control of a large estate, that this was a desire to take hold of something for profit or benefit is blind to the reality that it was all-important to know that these titles be invulnerable, because if they were defective, that defect would block out rehabilitation for years in the future.

"Then we had a statute to deal with. The Legislature, undoubtedly in a desire to be helpful to the certificate holders, passed the Schackno Law. Undoubtedly it was intended to be helpful to owners who were deeply oppressed, but what was the meaning of the statute? Was it an exclusive remedy or was it one additional remedy for the benefit of these investors? Was it a constitutional remedy? What were the devices to be employed under the statute, which was largely but a grant empowered to choose a plan. But what plan? These were all matters which in the fall of 1933,

indeed in the spring of 1934, were matters about which the Bar was disturbed; and, if I may take the liberty to say, your Honor, about which the courts of the State were disturbed; because the answer had not yet been given, and nobody knew the truth, because the truth would not be known until the highest courts of the State had told us what the law shall be.

" Then we were confused about the Real Property Law. Should we proceed on the theory that the Real Property Law applied to this? When a trust estate was involved could certificate holders and trustees who held certificates act under it? This was an additional difficulty considering how large a number of these certificates were held in various forms of trust estate.

" I mentioned that the company at the time was in rehabilitation. Fortunately that rehabilitation proceeding was pending in this very court. So that at least there was no conflict between the jurisdiction of the rehabilitators and the jurisdiction of the reorganizers. But even there arose an additional difficulty. Title to a large number of the properties in F and F-1, 36 of them, I think, were held in the hands of Land Estates and Liberdar, and these two companies had been placed into equity receiverships in the Federal Court. Now, the problem was to work out a solution for the certificate holders. Again I say it was not a problem of whether A, B, C or D shall manage this property. The problem was one of working out a solution which would give the certificate holders an invulnerable investment which they had purchased and to which they were entitled. All of these legal problems had to be resolved, and they had to be harmonized, and the views of attorneys had to be elicited, study and research had to be pursued; no one knew the answer; it had to be discovered and made — made by litigation — made by framing cases that would come before this Court and the other courts of this State.

" I remember distinctly how this Court sat at the head of this table with I suppose thirty or forty members of this Bar who came and discussed these questions with your Honor, in a manner — I suppose the nearest to it would be some of the discussions which the Greeks referred to in the ancient days of the philosophers. It was a novel and a new procedure indeed for the Bar of this City, and one which I think was universally approved, because we were all looking for light. On the financial side there were continuous conferences with the Superintendent, with the Deputy Superintendent, examination into the tax policy pursued by the concern, discussions as to whether or not moneys as they came in should be distributed to hard pressed certificate holders, or used to reduce the superior lien of the Municipal taxing authorities. All of those

matters had to be examined. On the certificate holders' side there was a tremendous problem — and I shall call it that — of bringing together and unifying the views of 4,600 investors living in almost every State of the Union, on the continent of Europe, and allaying their suspicions; because they tended to identify the marauders of the past with the salvagers of the present — and to make them realize that this was an effort in their behalf and not in behalf of those whom they believed wanted to destroy their property. It meant handling not ten, but hundreds of certificate holders in personal conferences. It meant correspondence which would take a truckload to bring it into this Court. It meant interviews and conferences with lawyers from every branch of the Bar, until that unity of view and that harmony of opinion and that confidence was achieved. Some of the steps in that proceeding your Honor well knows. I believe your Honor well knows all of them far better than I know them; and indeed I feel a little hesitant and humble to come here on this day and ask for compensation, as I certainly do, when I realize that in considering the share of work that we or any other group of attorneys accomplished, the leadership your Honor exerted is more like the mountain side of activity; but the Court is expected to do this without compensation, whereas lawyers come to be compensated.

" We had first the effort to reorganize the series on the theory that powers in trust had been created by the certificates, and that came in the *Matter of New York Title & Mortgage Co. (Heilbroner)*, where Maas and Davidson and Henry Hetkin pushed very vigorously in a very lawyer-like fashion, those proceedings. We differed, we doubted that the law conferred upon this trust the power to appoint trustees in the matter. Our concern was, again, that title shall be invulnerable. Consequently we took the other side.

" Then we had a proceeding up in Albany before Judge COOPER, before the District Judge in the Federal Court, and an attempt was there made to organize Series F-1, and had that succeeded, we probably would all be traveling back and forth between this City and Albany every time that an application was pending before the Court; and having had the pleasure to represent the trustees of F-1 since reorganization, and knowing how many times I have come before your Honor on applications for approval of one thing and another, and how frequent have been those applications, I feel additionally justified in the resistance we offered at that time to the attempt of the Federal Court to assume jurisdiction in Albany of the management of properties located in Manhattan and the Bronx.

"And then the corporate plan was promulgated. Now, when I say the corporate plan was promulgated, or the trustee plan was promulgated, some certificate holders may have the impression that we can sit down and call in the stenographer and say ' Take this,' and in a happy moment of inspiration, in the course of half an hour, dictate a plan. I do not have to state this for the information of the Court, but I believe it is useful to state for the information of the investors, that every one of those plans is created brick by brick out of the sweat and labor and thought and examination and research of days and days; that it is then published, republished, that it is subjected to criticism, that it is subjected to review. Because we have not here an estate worth a few hundred dollars where if we had a minute error in some clause subjecting us to a minute expense it would not be serious. Every minute aspect of this thing, the taxability of the trust, whether or not it was subject to the Securities Act, whether or not it was subject to other provisions of the State and Federal Law, whether or not the trustee should or should not have this, that or the other power, whether or not they might not be hindered in acting one way or the other. Why, we had to go to Albany to secure an amendment to permit two out of three trustees to act in the event that one should be away or disabled. Those things take time, they take effort and study, they take work and labor, and should be responsibly done, and I believe they have been responsibly done; and I say to your Honor, if there is going to be continued work responsibly done in the future, I think the certificate holders will concur in the view of this Court that the attorneys who rendered that service should be compensated.

" The trustee plan is the one that is most recent in our memory. Let me inform the investors, because the Court knows, that the trustee plan went through at least ten separate printed forms, and that each of them was materially different from its predecessor. Now, it was not because we are great lovers of variety that we put out these successive editions with the assistance of all the attorneys; including the attorneys for the Superintendent of Insurance. It was because every effort was superior to the preceding one. When we started out we were impelled to proceed on a powers in trust plan, because we doubted that under the laws of this State a trustee plan could be created; and in the course of those labors we were persuaded that a powers in trust plan would be inadequate; and while we were laboring on that we, therefore, had recourse to the Legislature for amendment of the Real Property Law to permit a straight trust plan; and it was not until that amendment was passed by the Legislature and signed by the Governor that the present

plan, which has become a part of the history of the real estate of the City of New York, was capable of being promulgated. When the trustee plan was promulgated there were differences between the Superintendent of Insurance, the Committee for the reorganization of Series F-1, and several other attorneys who represented certificate holders and participated in those discussions. An effort was made to harmonize all views. It took days of conference. Finally they were harmonized, so that the happy situation was achieved that when we came into this Court we were able to compress the proceedings into very brief time and all of the certificate holders were able to present to your Honor almost an unanimous viewpoint on amendments which should be incorporated. Then the plan was written into order by your Honor, and then first began a very important stage in reorganization, the obtaining of notarized consents to a plan of reorganization. I say ' notarized consent ' advisedly, your Honor, because I have had experience with the other kind of reorganization, and it will be a long time before I will have the fortitude to undertake another reorganization where acknowledged consents have to be obtained. Why, the letter writing, the interviewing, the telephoning, the persuading, the arguing with investors from all over the City, State and County, who thought that in some way we proposed to put their money in our pocket — and wouldn't we surrender it without going through the formality of signing a consent?

" Now, a word should be said about the expense of obtaining consents, your Honor. I was in another court a few weeks ago where a plan of reorganization was under consideration, an entirely different matter, and a contract for the approval of the Court was submitted. It was a contract between the company and a group of bankers, and the service that the bankers undertook to render was to secure consents to a plan of reorganization; and what was the fee stipulated in this contract? Not for legal services, not for reorganization expenses, but for the mere activity of obtaining consents. They asked for two and a half per cent of the face amount of the issue involved. And on top of that, lest they did not obtain consent, the bankers requested a $100,000 expense fund — and all that was involved there was $35,000,000, an issue not very substantially larger than this one. We resisted it in that court, we thought it was an outrageously high priced figure and it was reduced. It was reduced to one and a half per cent. Now, if the cost of obtaining consents in series F-1 had been one and a half per cent — let us say one per cent — it would have cost, on the basis of the $20,000,000 in consents obtained, $200,000. The actual expenses of the Committee for reorganization of Series F-1 in

gathering in the consents was $3,000. Now it seems to me, your Honor, that when we know that is the fact, when that is the husbandry with which every dollar of the certificate holders has been nursed and nurtured; when on top of that we are able to come to the Court on this day and say ' Your Honor, the issue has been successfully organized, a device has been discovered which gives them unified management and responsible management of their property under the continuing supervision of this Court; ' when we are able to come to your Honor and say that $279,000 has been distributed to certificate holders; when we are able to say to your Honor that the trustees have announced that on December 31st, $279,000 will again be distributed to the certificate holders; when I can say to your Honor that regardless of how generous you might be in the situation, you still would be dealing with figures which could not materially affect either the income or principal of this trust; it seems to me that we have a right to say to your Honor that we are not here for charity, that we are not asking the certificate holders to contribute something to the poor and the oppressed because that is not the fact. All we are asking the certificate holders is to think back in their times of distress, when their investment was in peril, when the security was doubtful in value, and to compare it to the present situation when their securities have gone up from seventeen to fifty-six; when they have begun to receive income, when they know that the future is secured, when there is a prospect that they may be able to recover all of their investment; then I say to them ' You have assumed no liability for compensation when you first started this proceeding. It was a matter which the attorneys who worked for you and rendered services for you did on a contingency and the hope and the possibility and the chance that they might be able to recover for you something of your investment,' and they say to you that they have.

" Now, when the attorneys labored on this thing — and when I say that I speak not only for ourselves, but for all those who joined hands with us and worked painstakingly and wholeheartedly with us, and for the members of the committee who labored unceasingly to bring about the harmony of viewpoint — I say that when we worked on this case we worked generously, we worked unstintingly, we gave up all we had without regard for self or person, without regard to whether today was Christmas or New Year's; the work went forward. And I challenge, if there be a certificate holder in this issue who can say that he was ever treated discourteously by the Committee or its counsel; or whoever felt that he was being abused or his interest not looked after; and I say we do not ask for generosity, because that is not the function of the Court, but we

do ask the Court to take the facts into consideration, and to give the attorneys no more than justice, because that is all they have a right to look for. I thank you."

The reorganization of series F-1 has produced results highly beneficial to the certificate holders. As the efforts to reorganize the issue reached an advanced stage, the market price of the F-1 certificates rose substantially. At the time the final order declaring the plan in effect was made in May, 1935, the certificates were quoted at about forty cents on the dollar. Since the court's appointment of the trustees under the plan of reorganization there has been a further rise in the market value of the certificates. An accounting filed by the trustees for the period ending December 31, 1935, reveals that they have distributed income aggregating $558,219.07 to the F-1 certificate holders, leaving them with a cash balance of $307,663.83. Taxes and penalties aggregating $446,561 have been paid and no taxes or water charges remained unpaid at the close of the year except as to one property, which is in the hands of a receiver. The budget filed by the trustees for the year 1936 indicates that they expect a net income of $1,109,002.83 after allowing for reserves and administrative expenses. This would leave $1,417,166.66 available for distribution to certificate holders, subject to decrease by the fees allowed herein and trustees' fees. On June 30, 1936, the trustees distributed a further sum of $558,219.18 to the certificate holders on account of interest. This brought the total interest payments made by the trustees in the first thirteen months of the trust up to $1,116,000, or four per cent of the principal amount of the outstanding certificates. The balance remaining in the trustees' income account is over $315,000. Arrears of interest aggregating $415,993.93 have been collected as a result of reorganization of mortgages held by the trustees. The cash position of the trust estate which has been improving steadily will become progressively stronger during the next six months since no real estate taxes will be payable by the trustees during that time. On August 31, 1934, when the Superintendent of Insurance promulgated the plan of reorganization, the tax arrears on F-1 properties amounted to $767,126.73. Not only have all these back taxes been paid up, but the trustees have even prepaid the taxes for the second half of 1936, thus earning the discount which the city allows for prepayment. The prepayment amounted to $125,094.53. At the present time no owners in arrears are in possession of any F-1 properties and savings have been effected by elimination of management leasing commissions, by taking over of twenty-two properties for direct management by the trustees, by quantity purchasing of fuel and supplies, and by the avoidance of the usual additional

expenses involved in purchasing under installment or conditional sales contracts.

The successful reorganization of series F-1 is not the work of any one man or firm. Many have contributed, in varying degrees. Some have merely been instrumental in obtaining the necessary consents to make the plan effective. Others have played prominent parts in the formulation of suggestions and ideas which were incorporated into the plan finally adopted. Others have helped in crystallizing sentiment in favor of a trustee plan. It is generally conceded, however, that by far the greatest part of the legal services involved was performed by the firm of Wagner, Quillinan & Rifkind, who carried the laboring oar over the period of about a year and a half which elapsed between the commencement of their efforts and the final order declaring the plan in effect. They performed their work diligently, perseveringly and with marked ability. All are agreed that they are entitled to a substantial allowance commensurate with the standing of the firm, the amount involved, the difficulties and magnitude of the problems encountered, the time and effort expended and the skill and ability displayed.

Some of the applicants for allowances were members of the committee. Letters circularized by the committee among the F-1 certificate holders stated that the " committee is a voluntary body of certificate holders, working *without compensation,* to bring about a reorganization for the benefit of the certificate holders." (Italics the court's.) Even if members of the committee might otherwise be entitled to compensation for their services as such, they cannot reasonably expect to receive allowances after having led the certificate holders to believe that they were acting gratuitously.

It does not follow, however, that membership in the committee is sufficient *in itself* to defeat an application for allowances. Several members of the committee have applied for compensation for *legal* services rendered by them. It is clear that for attendance at meetings and participation in discussions had therein they may not be paid. Such services were to be expected of members and are concomitants of membership. The applicants did, however, perform legal services of value to the certificate holders which they could not have reasonably been expected to perform merely because they happened to be members of the committee. Services rendered in connection with the corporate plan, which was ultimately abandoned, although not to be entirely disregarded, do not merit remuneration on the same basis as if the corporate plan had been adopted. In fixing the allowances hereinafter made to those members of the committee who performed legal services of value to the certificate holders, the court has applied the foregoing principles,

taking into consideration also the relative values of the services rendered by the applicants.

It should be noted that all the committee members who seek to be paid for services of a legal nature represented holders of F-1 certificates. The provisions of subdivision v of article VIII of the declaration of trust, previously quoted, authorize allowances only to " counsel *for certificate holders*," and this would be the proper rule even in the absence of any express provision as to counsel fees.

The affidavit of one of the applicants fails to establish that any valuable services were rendered except in procuring consents to the plan from clients of the firm. No allowance should be made here for work of this nature.

A claim for disbursements of $662.17 was submitted after the time fixed for the filing of claims had expired. Moreover, the expenses incurred by the claimant in making trips to this city from Washington, D. C., in order to attend the meetings of the committee and of the executive committee, are not properly chargeable to the F-1 certificate holders. The claim is disallowed.

A number of applicants seek substantial allowances to compensate them for services rendered in the various proceedings in the State and Federal courts previously referred to. Several of them participated in a proceeding to restrain the Superintendent of Insurance from making payments to attorneys engaged in working out corporate plans of reorganization under the Schackno Act. One of the grounds urged on behalf of the petitioner was the alleged unconstitutionality of that statute. The proceeding was, however, unsuccessful. (*Matter of People* [*New York Title & Mortgage Co. — Abrams*], *supra*.) Undoubtedly, this proceeding facilitated the reorganization of series F-1 in that it resulted in a ruling by our highest State court that the Schackno Act is constitutional. Without such a holding it is extremely improbable that the consents of two-thirds of the certificate holders could have been procured to any plan of reorganization promulgated under an act whose provisions were thought by many to be unconstitutional. It is likewise true that the committee and others desirous of seeing series F-1 reorganized were anxious to obtain a definite ruling by our highest court as to the constitutionality of the Schackno Act and welcomed the bringing of any litigation which would have that result. On the other hand, it must not be overlooked that the position taken by the petitioner in the *Abrams* proceeding was held by the Court of Appeals to be untenable and that the petition was dismissed. Had the petitioner's theory been sustained, reorganization of series F-1 *under the Schackno Act* would never have taken place. Moreover, the attorneys who conducted the

proceeding for the petitioner were never requested to do so by the committee, or, as far as appears, by any substantial group of F-1 certificate holders. As a matter of fact, the *Abrams* proceeding was not confined to series F-1 but, on the contrary, sought to enjoin the Superintendent from making payments in *all* issues of guaranteed mortgages held by certificate holders. Although the proceeding resulted in the clarification of the legal status of Schackno reorganizations and, to that extent, benefited certificate holders, it is the court's opinion that no allowances may properly be granted to the attorneys for the unsuccessful petitioner from the funds belonging to the F-1 certificate holders. *A contrary view would lead to an anomalous situation.* Undoubtedly, the services rendered by counsel for the committee in *opposing* the *Abrams* proceeding are among those for which they are entitled to receive compensation. Their opposition was successful and resulted in the upholding of the validity of the Schackno Act under which series F-1 was finally reorganized. To pay, in addition, the attorneys who represented the petitioner in the *Abrams* matter for their unsuccessful efforts would mean that the F-1 certificate holders would be financing both sides of the litigation. Furthermore, as previously observed, the proceeding sought relief affecting all certificated issues and its indirect efforts were beneficial to all such issues and not merely to series F-1. There can be no *legal* justification, under all the circumstances, for imposing the burden of payment upon the F-1 funds.

Similar observations are applicable to services rendered by some of the applicants on behalf of the unsuccessful petitioner in *Matter of New York Title & Mortgage Co. (Heilbroner) (supra).* This proceeding, too, was opposed by counsel for the committee, and for the services thus successfully rendered counsel for the committee are unquestionably entitled to an allowance. Had the proceeding been successful, the reorganization *under the Schackno Act* would never have been consummated. In the court's opinion, no additional allowance may be granted to the attorneys for the defeated petitioner. In reaching this conclusion the court is fully cognizant of the fact that the *Heilbroner* proceeding played a very important part in causing the Superintendent of Insurance and the committee to switch from the corporate plan to the trustee plan finally adopted. The proceeding focused attention upon the advantages of the trustee plan and led to a reconsideration by the Superintendent and the committee of the relative merits and demerits of the corporate and trustee plans. As a result, the Superintendent and the committee decided that a trustee plan should be promulgated in the place of the corporate

plan theretofore promulgated. Had the *Heilbroner* proceeding not been brought, it is not unlikely that the reorganization of series F-1 under the trustee plan, which met with the enthusiastic favor of the certificate holders, would, to say the least, have been delayed for an extended period. It is even possible that it would have failed completely. It does not follow, however, that an allowance may be granted here for services rendered in support of a proceeding which has been held to be without legal foundation. The services of the attorneys who represented the petitioner were performed with great ability and skill and proved of great indirect value to the certificate holders of series F-1, as well as to those of other issues. It is with regret that the court reaches the conclusion that the law does not permit these attorneys to be compensated for their arduous labors in the *Heilbroner* proceeding.

In a somewhat different category are the services performed by various attorneys in opposition to the application made to the United States District Court for the Northern District of New York for the appointment of trustees for *all* certificated issues of the New York Title and Mortgage Company. The granting of this relief would undoubtedly have had a disastrous effect upon the attempts then under way to reorganize series F-1 and the other issues involved. Counsel for the F-1 committee prepared papers in opposition to the motion and participated in the argument before the District Court. Although the application was granted, the order was reversed by the Circuit Court of Appeals on an appeal taken by the Superintendent. (*Tolfree* v. *N. Y. T. & M. Co.*, *supra.*) In the meantime, after the District Court had handed down an opinion directing the submission of an order appointing trustees, several attorneys who now seek allowances attempted to restrain further action by that court by a writ of prohibition, while others applied for leave to intervene in the proceeding so as to be in a position to appeal from the order. The motion for a writ of prohibition was denied by the Circuit Court of Appeals (*Matter of Heilbroner*, 69 F. [2d] 643) and a similar motion was denied by the United States Supreme Court. The motion for leave to intervene was likewise denied and an application to the Circuit Court of Appeals for a writ of mandamus directing the District Court to sign an order denying the petitioner's motion for leave to intervene was also denied. It is difficult to justify an allowance for services rendered in unsuccessful attempts to obtain leave to intervene and a writ of prohibition, particularly in view of the fact that they were performed by attorneys who did not appear in the proceedings as representatives of the F-1 committee or on behalf of certificate holders of the F-1 issue as such, but rather on behalf of

certificate holders generally. No allowances for these services may properly be made in this proceeding.

A number of other applications were made in this court and also in the Federal court by some attorneys now requesting allowances. Some of these were withdrawn and others denied. Claims are also made for services rendered in opposing certain proposed laws affecting the guaranteed mortgage situation which were deemed to be prejudicial to the interests of certificate holders, and also for similar services. None of these applications or claims may be allowed.

Some of the applicants did, however, perform services which were of substantial value to the F-1 certificate holders as such and which directly affected the provisions of the plan of reorganization ultimately adopted, besides contributing to the certificate holders' favorable response to the plan as modified by the court. Such services include the following: (1) Opposition to the original corporate plan promulgated by the Superintendent of Insurance, including analysis of its defects and disadvantages from the standpoint of the certificate holders; (2) bringing out evidence demonstrating the unfavorable results of administration of the affairs of series F-1 by the then Superintendent of Insurance, as a consequence of which the plan promulgated by the latter was modified by (a) shortening the period for nomination and election, (b) limiting the enlarged powers proposed to be conferred upon the Superintendent in the plan, and (c) providing that a State agency could not be selected sole trustee except by the affirmative vote of two-thirds in principal amount of all the F-1 certificate holders; (3) study of legal and practical problems involved in working out an appropriate trustee plan; (4) conferences with counsel for the Superintendent, counsel for the committee, and other attorneys, and also furnishing of advice and suggestions in connection with the formulation of the trustee plan finally promulgated; (5) preparation of many modifications to the plan promulgated by the Superintendent, believed to be necessary in the interest of the certificate holders; (6) attendance at and participation in the extended hearings held on the trustee plan and the offering of numerous amendments to the plan; and (7) suggesting of further amendments after the final opinion on the plan and before the signing of the interlocutory order. This brief summary does not by any means embrace all the valuable services rendered nor does it present an adequate portrayal of the quantity, quality and value of the work performed. It suffices, however, to give some slight indication of the general nature of the services for which allowances may appropriately be made in the present proceeding.

The question of the proper amounts of the respective allowances is somewhat complicated by the extravagant claims made by many of the applicants as to the value of their services. In numerous instances the same modifications or amendments were suggested by a group of attorneys and yet each seeks to be paid for them as if they were solely his own. More than one applicant claims that he is the originator of the trustee plan or that he alone is entitled to most of the credit for its adoption. Fortunately, this court is intimately familiar with the history and development of the trustee plan, having, so to speak, lived with the guaranteed mortgage situation and the problems connected therewith since it was placed in charge of rehabilitation early in August, 1933. Attorneys for various groups of certificate holders have been kind enough to state at the hearing that the largest part of the credit for the trustee plan and the successful reorganization of series F-1 properly belong to this court. Counsel for the reorganization committee, after referring to the various steps in the reorganization, said: " I believe your Honor well knows all of them far better than I know them; and indeed I feel a little hesitant and humble to come here on this day and ask for compensation * * * when I realize that in considering the share of work that we or any other group of attorneys accomplished, the leadership your Honor exerted is more like the mountainside of activity." Another attorney declared that " in large measure the trustee plan, in its ultimate form, is the result of work of the Court." Counsel for the chamberlain of the city of New York stated that " If there is any question of the paternity of the plan, it has been pretty well decided in favor of your Honor." Although this court has, from the very first, advocated reorganizations of the trustee type as most beneficial to the interests of the certificate holders, and has exerted every effort to bring about the adoption of the trustee plan in reorganizations under the Schackno Act (and later under the Mortgage Commission Act), it feels that no one individual is entitled to be called the father of the trustee plan. The plan as finally worked out had no single author, originator or inventor. It is the product of a gradual evolution, to which many individuals and forces contributed in greater or less degree. The advantages, from the standpoint of the certificate holders, of the trustee plan of reorganization which has been worked out for series F-1 have been so marked as to attract the favorable attention of the Federal Securities and Exchange Commission, which has been studying the subject of trustees under indentures. The Commission, in a report to Congress made on June 18, 1936, pointed out that the declarations of trust adopted by this court in mortgage reorganizations, of which F-1 was the first, placed the trustees

" under a higher standard of obligation to the security holders than trustees under other indentures," and that " a striking feature of this standard form declaration of trust is the form of the exculpatory clause which, unlike the ordinary form under which the trustee is liable only for gross negligence or wilful misconduct, provides that the trustee is liable for mere negligence." The Commission points out that " this type of trusteeship has developed out of a situation of unique complexity and peculiar difficulty," and recommends that a similar type of trusteeship be adopted in other fields. The report also emphasizes the fact that the compensation provisions of the trustee plans adopted by this court have the effect of encouraging activity rather than passivity on the part of trustees. Instead of permitting trustees to receive fixed compensation regardless of their services, the plans, in addition to fixing *maximum* compensation, make the actual compensation awarded dependent entirely upon the services rendered, thus giving the trustees incentive for the exercise of initiative in promoting the interests of the certificate holders. As early as February 2, 1934, this court advocated the adoption of trustee plans of reorganization, pointing out that trustees would at all times be subject to the supervision and control of the court and recommending that compensation should be based solely upon actual services rendered. (*Matter of N. Y. T. & M. Co.*, 150 Misc. 488, 492.)

"Although possessed of the powers of the guaranty companies, the trustees would at all times be subject to the direct supervision and control of the Supreme Court by reason of that court's well established jurisdiction over trusts and trustees. The trustees would at all times be accountable for their acts. Certificate holders aggrieved by the actions or failure to act of their trustees would be entitled to require the latter to justify their conduct before the court and to account. In this respect the certificate holders, if trustees should be appointed, would possess much greater rights than they had during the exercise of the powers in trust by the guaranty companies and than they have now while those powers are exercised by the Superintendent of Insurance. * * *

" The work should be regarded as a public service and the fees of the trustees should be limited accordingly. *A waiver of statutory commissions should be exacted as a condition of the appointment of any trustee and compensation should be fixed only after the rendering of services and upon the basis of the services rendered.*" (Italics the court's.)

The plan of reorganization for series F-1, submitted for judicial approval, adopted this suggestion of the court in regard to com-

pensation, providing, in article III thereof, for a waiver of the statutory commissions by the trustees and substituting an agreement to accept compensation " upon the basis of time and effort spent by each Trustee " which, in no event, was to exceed " statutory commissions." This provision was modified by the court so as to *reduce* the maximum compensation to one-quarter of one per cent of the principal amount of the outstanding certificates. The exculpatory clauses of the proposed plan in the form submitted were also modified by this court by eliminating the provision, in subdivision h of article XIII of the plan submitted by the Superintendent of Insurance, that a trustee was to be personally liable to the certificate holders only for his own willful misconduct (same case, p. 880), and inserting instead a provision " that nothing in this Declaration of Trust contained shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or negligence." (*Matter of N. Y. Title & Mortgage Co.*, 153 Misc. 858, 880.)

Some additional comment should be made as to one of the applications for allowances. Aside from a number of motions made by the applicant in this court and in the Federal court, which were ultimately withdrawn or denied, the principal services rendered by him consist of the following: (a) Opposition at the hearings on the trustee plan to the proposal of other certificate holders that the plan be modified so as to permit the appointment of temporary trustees; (b) recommendation at the hearings that the time for the nomination and election of trustees be shortened; (c) suggestion that the court select one or more trustees; (d) proposal of a number of amendments to the plan which, to a very large extent, represent duplications of amendments suggested by a number of other attorneys. For these services, most of which were rendered within a comparatively short period of time, the applicant asks for an award, which " should be not less than one-half of the sum to be awarded to the said Wagner, Quillinan & Rifkind." On the strength of the fact that the position taken by this applicant happened to coincide, in certain respects, with that taken by the court, the applicant claims credit for the plan as modified by the court and ultimately approved by the certificate holders. The difficulty with the applicant's claim is that he seems to assume that had he not presented his views at the hearings on the plan, the court would not have reached the conclusion which it did and would have modified the plan by providing for the appointment of temporary trustees. The court knows that the action it took upon the plan would have been the same even if the applicant had omitted to give it the benefit of his opinion. The language of the Court of Appeals in

*Matter of Attorney-General* v. *North American Life Ins. Co.* (91
N. Y. 57) is very much in point here (p. 65): " It assumes that the
court would have gone wrong but for the good advice it got."
Mention might also be made here of the following statement by
Judge Coxe, of the United States District Court in the Southern
District of New York, in his recent opinion in *Matter of Paramount
Publix Corp.* (12 F. Supp. 823):

" Any creditor or stockholder is entitled as of right to be heard
on the question of the permanent appointment of any trustee or
trustees, and on the proposed confirmation of any reorganization
plan,  *  *  *.  But mere participation in the hearings at which
these questions are discussed, or offering advice, suggestions, or
criticisms regarding the proposed plan, or on matters of procedure,
does not give rise to any claim for compensation from the estate.
These are services for which attorneys should look to their own
clients for payment."  The court believes that the applicant is
entitled to compensation for his efforts in connection with the
reorganization of series F-1, but it cannot appraise the value of
his services on the basis suggested by him.

Some question has been raised as to the court's right to make
allowances to attorneys other than counsel for the committee.
The provisions of subdivision v of article VIII of the declaration of
trust, approved by more than two-thirds of the certificate holders,
expressly authorize allowances not only to counsel for the com-
mittee, but also to " counsel for certificate holders who have ren-
dered services which have proved of value to the certificate holders
in connection with the readjustment, modification or reorganization
of the rights of all holders of said Series F-1 certificates."  This
provision, in the court's opinion, neither enlarges nor limits the
rights to allowances which would exist, in the absence of any express
provision, under well-established principles of equity jurisdiction.
It does no more than codify, as part of the plan of reorganization,
the principles which ordinarily govern allowances in reorganiza-
tions.  The fact that there is universal agreement that counsel for
the committee are entitled to an allowance is, in itself, some recog-
nition of the propriety of also compensating others who have
rendered valuable services, for the status of the committee and its
counsel was no more official than that of the others and there is,
therefore, no legal basis for limiting compensation to the services
performed by counsel for the committee.

In determining the amount of the allowances which are to be
made to those applicants whose services merit them, the court
has kept uppermost in its mind the plight of the unfortunate cer-
tificate holders.  They have not received any substantial amount

of interest for about three years and, of course, no payments of principal. Many of them are in straitened circumstances. Some have invested their entire life savings in these and similar certificates. Many of the certificates represent funds invested for incompetents, infants and widows. The public aspect of the situation was recognized by the Legislature itself in enacting the Schackno Act, which has been upheld by the Court of Appeals as " emergency " legislation. Section 1 of that statute states that " the Legislature hereby declares the existence of a public emergency affecting the health, safety and comfort of the people " and further, that " such mortgage investments are widely held by hundreds of thousands of investors, a large percentage of whom are persons of only moderate means." Allowances payable out of funds belonging to certificate holders must necessarily be considerably less than they would be under ordinary and normal circumstances.

Another factor to be considered in fixing the allowances is the fact that a substantial amount of the work involved in effecting the reorganization was performed by counsel for the Superintendent of Insurance. Much of the paper and routine work involved was also performed by the Insurance Department. A comparison of the size of the allowances in this proceeding with those granted in other reorganizations in State and Federal courts must take into consideration the situation of the certificate holders as well as the services contributed by the Insurance Department and its counsel.

The situation which confronted certificate holders after the collapse of the guaranty companies was one which virtually demanded the public-spirited assistance of those members of the bar who were in a position to give it. Fortunately, there were some who responded and devoted a substantial amount of time and effort without any thought of compensation. The fact that some public-spirited citizens served without compensation should not, however, affect the allowances requested by others who labored long and valiantly in the interest of the F-1 certificate holders. Not every one is in a position, even should he desire it, to work without compensation. Moreover, the court cannot ignore the fact that the efforts of a number of the attorneys who seek allowances conferred substantial benefits upon the F-1 certificate holders, as evidenced by the great rise in the market price of the certificates and also by the amount of interest already distributed by the trustees.

After long and careful deliberation, the court has come to the conclusion that under all the circumstances the following allowances represent the fair and reasonable value of those services rendered by the respective applicants for which compensation may be awarded in this proceeding:

| Name of applicant | Amount asked | Amount allowed | Disbursements allowed |
|---|---|---|---|
| Wagner, Quillinan & Rifkind | Unspecified... | $50,000 | $3,038 55 |
| Henry Hetkin | Unspecified... | 13,500 | |
| Thomas Keogh | Unspecified... | 8,500 | |
| Leon Leighton | Unspecified... | 10,000 | |
| Smith, Chambers & Clare | $50,000 | *7,500 | |
| Abraham N. Geller | Unspecified... | 3,500 | |
| Chamberlain of the City of New York | None asked... | ....... | 850 00 |
| Maurice and Daniel Blumenthal | $50,000 | *2,500 | |
| Olney & Gear | 35,000 | 2,500 | |
| Potter & Potter | 15,000 | 1,000 | |
| George Goldberg | 10,000 | 500 | |
| Jacob Rieger | 15,000 | 1,000 | |
| Montague S. Mendelsohn | 2,500 | 250 | |
| Albert W. Pross | 10,000 | 500 | |
| Flynt & Sully | 250 | 150 | |
| Thomas Berry | 15,000 | 500 | |
| Maass & Davidson | Unspecified... | 2,000 | |
| Edward Endelman | Unspecified... | 7,500 | |
| Julius S. Pines | 10,000 | 500 | |
| Kotzen, Mann & Siegel | Unspecified... | ........ | |
| Covert F. Crowder | None asked... | ........ | |
| | | $111,900 | $3,888 55 |

As previously indicated, these allowances would have been considerably larger were it not for the fact that they must be met out of funds of certificate holders who are, to a large extent, in distress and need. The total of all the allowances and disbursements is $114,788.55, which is about four-tenths of one per cent of $27,899,156.67, the principal amount of the F-1 issue. This means that the cost of the reorganization is about forty cents to the holder of a $100 certificate, payable out of moneys now in the hands of the trustees without, of course, any assessment upon the certificate holders. In no other reorganization that has been called to the court's attention have the aggregate allowances constituted so small a percentage of the principal amount involved.

Submit order on notice.

* Inclusive of allowable disbursements.